2022 IL App (4th) 210008

NO. 4-21-0008

FILED
January 12, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| SAVE OUR ILLINOIS LAND, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, and WILLIAM KLINGELE, | ) Appeal from an Order of the ) Illinois Commerce Commission ) |
| Plaintiffs-Appellants, | ) |
| v. | ) |
| THE ILLINOIS COMMERCE COMMISSION; DAKOTA ACCESS, LLC; ENERGY TRANSFER CRUDE OIL COMPANY, LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 702; LABORERS' INTERNATIONAL UNION OF NORTH AMERICA; SOUTHWESTERN ILLINOIS LABORERS' DISTRICT COUNCIL; GREAT PLAINS LABORERS' DISTRICT COUNCIL; and SOUTHERN AND CENTRAL ILLINOIS LABORERS' DISTRICT COUNCIL AND ITS AFFILIATED LOCAL UNIONS 231, 622, 773, AND 1197, | ) Docket No. 19-0673 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants-Appellees. | ) |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1 Dakota Access, LLC (Dakota Access), and Energy Transfer Crude Oil Company, LLC (Energy Transfer), which, collectively, we will call "the carriers," own a crude-oil pipeline that runs hundreds of miles through Illinois, from the northwest to the south. Dakota Access owns the pipeline from Hamilton, Illinois, to Patoka, Illinois, and Energy Transfer owns the rest of the

pipeline, from Patoka to Joppa, Illinois. The carriers petitioned the Illinois Commerce Commission (Commission) for permission to add more pumping stations to this Illinois pipeline.

¶ 2        In the administrative proceeding on the carriers' petition, two groups intervened. One group opposed the petition: Save Our Illinois Land, Sierra Club, Natural Resources Defense Council (Natural Resources), and William Klingele. We will call this group "the objectors." The second group of intervenors advocated for the carriers' petition: International Brotherhood of Electrical Workers, Local 702; Laborers' International Union of North America; Southwestern Illinois Laborers' District Council; Great Plains Laborers' District Council; and Southern and Central Illinois Laborers' District Council and its affiliated Local Unions 231, 622, 773, and 1197. We will call them collectively, "the unions."

¶ 3        After hearing evidence, the Commission granted the carriers' petition to construct the additional pumping stations. The objectors petitioned for a rehearing, and the Commission denied their petition. Now the objectors appeal to the appellate court. In their appeal, they make seven arguments.

¶ 4        First, the objectors contend that the Commission erred by failing to apply section 15-401 of the Public Utilities Act (Act) (220 ILCS 5/15-401 (West 2020)) to the petition to construct the pumping stations. To the extent, however, that section 15-401(a) (*id.* § 15-401(a)) was applicable, it was satisfied. The carriers already possessed the certificates in good standing that section 15-401(a) required. Contrary to the objectors' contention, the carriers did not have to obtain new or amended certificates in good standing in order to install additional pumping stations on their completed pipelines. Section 15-401 says nothing about obtaining new or amended certificates in good standing.

¶ 5         Second, the objectors complain that the Commission's decision fails to provide sufficient factual findings and reasons to make possible an informed judicial review. We find the Commission's single-spaced 80-page decision to be adequate to that purpose.

¶ 6         Third, the objectors claim that, in its assessment of the public need for the proposed pumping stations (see *id.* § 8-503), the Commission misapplied case law and failed to consider substantial evidence that militated against a finding of public need. The objectors argue, and we agree, that the Commission misinterpreted a prior decision of ours as equating the "public" with the world. Under section 8-503, the Commission must consider the public need for the proposed improvement, but the "public," in the broadest sense of that word, is the United States, not the world. We are unconvinced by the objectors' argument, however, that the Commission failed to *consider* the evidence adduced against the claim of public need. Just because the Commission did not give the opposing evidence the weight that the objectors believe it deserved, it does not follow that the Commission failed to consider the evidence.

¶ 7         Fourth, the objectors contend that the Commission erred by regarding itself as federally preempted from addressing the risk of greater leakage posed by nearly doubling the throughput of the pipeline. In its decision, the Commission recounted evidence that the carriers' leak-detection system could not readily detect leaks of less than 1% of throughput flowing past a given point per hour. But then, at the conclusion of the part of its decision in which the Commission discussed the leak-detection system, the Commission announced that it would "not rule on this issue" because (1) "the safety regulation of petroleum pipelines" was "within the jurisdiction of [Pipeline and Hazardous Materials Safety Administration]" and (2) "inconsistent state requirements [were] specifically preempted." The Pipeline Safety Improvement Act of 2002 does indeed forbid "[a] State authority [to] adopt or continue in force safety standards for interstate

pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c) (2018). If the Commission had denied permission to construct the proposed pumping stations and if the Commission had cited, as the reason for the denial, the inability of the leak-detection system to readily detect leaks of less than 1% of throughput, the Commission thereby would have adopted a safety standard for this interstate pipeline. The Commission is correct that it is federally preempted from doing so. See *id.*

¶ 8        Fifth, the objectors criticize the Commission for ignoring evidence of discrimination by the carriers in their treatment of shippers (that is, users of their pipeline). According to the objectors, some of the transportation shipping agreements, or contracts for transportation of crude oil through the pipeline, have provisions illegally favoring some shippers over other shippers. Because of these discriminatory provisions, the objectors argue, the agreements are void and unenforceable as violative of state and federal law, and the increased throughput that the void agreements purport to require really is unrequired. If the transportation shipping agreements are void, the reasoning runs, the need for additional pumping stations to fulfill the agreements is illusory. A weakness of this reasoning is that the invalidity of the agreements as a whole does not automatically follow from the invalidity of some of their provisions. The objectors do not show, nor do they even argue, that the contractual provisions in question are essential and inseverable.

¶ 9        Sixth, the objectors accuse the Commission of "arbitrarily and capriciously prohibiting inquiry into the operator's record." The "operator," in this context, is Sunoco Pipeline, L.P. (Sunoco). The carriers have subcontracted the operation of their Illinois pipeline to Sunoco. In view of that fact, the objectors offered evidence that, in Pennsylvania, Sunoco repeatedly had been fined for safety and environmental violations in its operation of pipelines there. The

Commission sustained the carriers' irrelevancy objection to this evidence from Pennsylvania. That ruling, we hold, was an abuse of discretion. Sunoco's conduct as a pipeline operator in Pennsylvania is relevant to "the security *** of *** the public" (220 ILCS 5/8-503 (West 2020)) and ought to be taken into consideration.

¶ 10 Seventh, the objectors claim that the Commission "arbitrarily and capriciously refus[ed] to acknowledge" the evidence they had presented of a steep decline in oil demand as COVID-19 had spread over the world. But the Commission did acknowledge that evidence. The objectors presented online documentation that the per-barrel price of oil had declined by 50% in less than a year and that, because of reduced demand, there was a glut of oil on the market. The Commission took the objectors' point. The Commission agreed that the pandemic "certainly [would] lead to some questions about future need." At the same time, however, the Commission could have reasonably assumed that the pandemic would be temporary and that the demand for oil eventually would return to prepandemic levels.

¶ 11 In sum, we agree with some of the arguments that the objectors make, and we disagree with their other arguments. We find enough merit in their third and sixth arguments that a remand is necessary. Therefore, we vacate the Commission's decision, and we remand this case to the Commission for further proceedings.

¶ 12 I. BACKGROUND

¶ 13 A. The Certificates in Good Standing

¶ 14 On December 9, 2015, in *Energy Transfer Crude Oil Co.*, Ill. Comm. Comm'n No. 14-0755 (Order-Final Dec. 9, 2015), the Commission issued to Energy Transfer a certificate in good standing. The certificate provided three authorizations.

¶ 15        First, citing section 15-401 of the Act (220 ILCS 5/15-401 (West 2014)), the certificate authorized Energy Transfer "to operate as a common carrier by pipeline" within a 500-foot-wide corridor of land that was about 128 miles long. The corridor began near Patoka, in Marion County; extended southeast "to a point of intersection with an existing natural gas pipeline" near Johnsonville, in adjoining Wayne County; and then followed that existing natural gas pipeline south to Joppa, in Massac County, on the Ohio River.

¶ 16        The second authorization in the certificate cited both section 8-503 and section 15-401 of the Act (*id.* §§ 8-503, 15-401) and gave Energy Transfer authority to "construct, operate[,] and maintain the Project along such route." The "Project," in this context, meant constructing 31 miles of new pipeline from Patoka to Johnsonville and converting the existing 97-mile natural-gas pipeline, from Johnsonville to Joppa, to a crude-oil pipeline.

¶ 17        The third authorization in Energy Transfers's certificate in good standing cited section 8-509 of the Act (*id.* § 8-509) and gave Energy Transfer permission to "take and condemn" easements for the project.

¶ 18        On December 16, 2015, in *Dakota Access, LLC*, Ill. Comm. Comm'n No. 14-0754 (Order-Final Dec. 16, 2015), the Commission likewise issued to Dakota Access a certificate in good standing. Citing section 15-401 (220 ILCS 5/15-401 (West 2014)), the certificate authorized Dakota Access to "operate as a common carrier by pipeline" within a 500-foot-wide corridor of land extending 180 miles southeast across Illinois, from Hamilton, in Hancock County, on the Iowa border, to Patoka, "where the Pipeline [would] connect with several of the existing tank farms located near Patoka and with the proposed pipeline of Energy Transfer." *Dakota Access, LLC*, Ill. Comm. Comm'n No. 14-0754, at 53.

¶ 19 Like the certificate in good standing issued to Energy Transfer, the one issued to Dakota Access provided two further authorizations. Citing sections 8-503 and section 15-401 of the Act (220 ILCS 5/8-503, 15-401 (West 2020)), the certificate authorized Dakota Access to construct, maintain, and operate the proposed pipeline—which would all be new construction. Finally, pursuant to 8-509 (*id.* § 8-509), the certificate in good standing authorized Dakota Access to "take and condemn" the necessary easements for the construction of the new pipeline.

¶ 20 The lands were condemned, and the pipeline was constructed—Dakota Access's pipeline joined to Energy Transfer's pipeline. Since 2017, crude oil has been flowing through this Illinois pipeline, which is part of an interstate pipeline system that transports crude oil from the Bakken Formation of North Dakota all the way down to Nederland, Texas, on the Gulf Coast.

¶ 21 B. The Carriers' Joint Petitions to Install Additional Pumping Stations

¶ 22 On June 14, 2019, the carriers filed a joint petition under section 8-503 (*id.* § 8-503) to construct new pumping stations on their pipeline to increase the throughput from 570,000 barrels per day to 1.1 million barrels per day. Specifically, the carriers proposed to (1) construct a new pump station in Hancock County, along the Dakota Access pipeline; (2) construct two new pumps and replace two pumps at an existing pump station in Patoka; and (3) construct a new pump station along the Energy Transfer pipeline in Massac County. No eminent domain would be necessary for the pumping-station project. The expected cost of the Illinois portion of the project would be $190 million to $200 million.

¶ 23 To prove the need for these proposed improvements, the carriers cited projections from the United States Energy Information Administration that oil production from the Bakken region would continue to increase through 2050. Also, the carriers pointed out that they had entered into long-term transportation shipping agreements with shippers that committed them—both the

carriers and the shippers—to sending greater volumes of oil through the Illinois pipeline than the pipeline could handle without the additional pumping stations.

¶ 24    The objectors countered that the COVID-19 pandemic had greatly reduced the worldwide demand for oil and that the carriers' projections of future oil production were, therefore, overly sanguine. Also, the objectors warned that the additional pumping stations would accelerate climate change and, by increasing throughput, would worsen the calamity of a pipeline leak should one ever occur.

¶ 25    On October 14, 2020, after evidentiary hearings, the Commission issued a decision authorizing the construction of the additional pumping stations. The objectors appeal. We will delve deeper into the facts of this case as we discuss the issues that the objectors raise.

¶ 26                                    II. ANALYSIS

¶ 27    A. The Commission's Request That We Dismiss Natural Resources From This
                Appeal Because Natural Resources Did Not Sign the Application for a Rehearing

¶ 28    After the Commission issued its order, Save Our Illinois Land, Sierra Club, and William Klingele filed with the Commission a verified application for a rehearing. Natural Resources, though named therein as a supporter of the application for a rehearing, did not sign it. See 83 Ill. Adm. Code 200.130 (2019). Consequently, on the authority of sections 10-113(a) and 10-201(b) of the Act (220 ILCS 5/10-113(a), 10-201(b) (West 2020)) and on the authority of *People ex rel. Ryan v. Illinois Commerce Comm'n*, 298 Ill. App. 3d 483, 488 (1998), the Commission argues that we should dismiss Natural Resources from this appeal.

¶ 29    Neither of those statutory sections says, however, that the party appealing must be the same party who filed with the Commission the application for a rehearing. Instead, all the

legislature insists upon, in those sections, is that a ground be raised in an application for a rehearing before the ground is raised on appeal. Section 10-113(a) reads as follows:

> "No appeal shall be allowed from any *** decision of the Commission unless and until an application for a rehearing thereof shall first have been filed with and finally disposed of by the Commission ***. No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission." 220 ILCS 5/10-113(a) (West 2020).

Thus, the limitation, on appeal, is to the *grounds* raised in the application for a rehearing. The limitation is not to the *parties* who raised the grounds in the application.

¶ 30        Similarly, section 10-201(b) reads as follows: "[N]or shall any person or corporation in any court urge or rely upon any grounds not set forth in such application for a hearing before the Commission ***." *Id.* § 10-201(b). All this section requires is that the grounds that the person or corporation raises on appeal be "grounds set forth in such application for a hearing before the Commission." *Id.* We do not see, in the statutory text, any requirement that the person or corporation raising the grounds on appeal be the same person or corporation that raised the grounds in the application for a rehearing before the Commission. Section 10-201(b) is satisfied if the grounds were "set forth" (note the passive voice) "in such application." *Id.*

¶ 31        Significantly, in the next subsection of section 10-201, the legislature demonstrates that it knows how to explicitly exclude parties who omitted to file a required document. Section 10-201(c) reads, "No appellate court [*sic*] shall permit a party affected by any *** decision of the Commission to intervene or become a party plaintiff or appellant in such court who has not taken an appeal from such *** decision in the manner as herein provided." *Id.* § 10-201(c). The legislature similarly could have forbidden the appellate court to permit a party affected by the

Commission's decision to be an appellant unless that party had applied to the Commission for a rehearing. The legislature did not do so. Instead, in section 10-201(b) (*id.* § 10-201(b)), the legislature prescribed only that the grounds be raised—by someone—in an application for a rehearing before the grounds were raised on appeal.

¶ 32        "The purpose of requiring the matters to be raised in the petition for rehearing is to inform the commission and the opposing parties wherein mistakes of law and fact were made in the order." *Granite City v. Illinois Commerce Comm'n*, 407 Ill. 245, 250 (1950). It is irrelevant to the accomplishment of that purpose whether the party who raises the grounds in the petition for a rehearing is the same party who later raises the grounds on appeal.

¶ 33        Granted, in *People ex rel. Ryan*, 298 Ill. App. 3d at 488, the appellate court said, "[T]he Act requires that a party must file a petition for rehearing before bringing an appeal ***." In that case, however, no valid petition for a rehearing was filed at all because the "petitioners' applications for rehearing were untimely." *Id.* at 485. So, *People ex rel. Ryan* is not on point.

¶ 34        In short, then, we see no reason, in statutory law or case law, to dismiss Natural Resources from this appeal. Therefore, we deny the Commission's request to do so.

¶ 35                    B. The Questions the Appellate Court May Consider

                           in Reviewing a Decision by the Commission

¶ 36        According to case law, judicial review of a decision by the Commission is limited to four questions: "(1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated." *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476 (1994).

¶ 37        "Substantial evidence" is a term of art. The appellate court has defined it as "evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence." *Id.* at 479. A question might well be asked: If there is less than a preponderance of evidence that a proposition is true, say only a 40% chance—which is to say, the proposition is probably untrue—would *any* reasonable mind accept the evidence as sufficient to support the proposition? The answer, of course, is no. What the definition of "substantial evidence" really means to convey, however, is that if reasonable minds (thinking reasonably) could differ as to where the preponderance of the evidence lies, the reviewing court should defer to the Commission's finding or conclusion of fact. "Substantial evidence" is simply "evidence that a reasonable mind might accept as adequate to support a conclusion." (Internal quotation marks omitted.) *Welch v. Hoeh*, 314 Ill. App. 3d 1027, 1035 (2000). The substantial-evidence standard is the same as the manifest-weight standard. See *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995) (explaining that "[a] finding is against the manifest weight of the evidence if all reasonable persons would agree that the finding is erroneous and that the opposite conclusion is evident").

¶ 38                          C. Our Standards of Review

¶ 39        "[D]ecisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such *** decisions." 220 ILCS 5/10-201(d) (West 2020). Thus, the default position, the position from which we begin, is that the Commission's decision is factually and legally reasonable. The appellants—in this case, the objectors—have the burden of making arguments that are persuasive enough to move us from that default position.

¶ 40      Appellants can challenge the Commission's decision (1) on the facts, (2) on the law, or (3) on the Commission's application of undisputed law to undisputed facts. For each of those three challenges, the supreme court has prescribed a different standard of review. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 41      First, the Commission's findings and conclusions of fact are deemed to be *prima facie* true and correct, and the party challenging the finding or conclusion of fact has the burden of showing it to be against the manifest weight of the evidence. 220 ILCS 5/10-201(d) (West 2020); see *Cinkus*, 228 Ill. 2d at 210. A finding or conclusion of fact is against the manifest weight of the evidence only if the finding or conclusion is arbitrary, unreasonable, or not based on the evidence or only if it is clearly evident, from the record, that the trier of fact should have reached the opposite finding or conclusion. See *In re Estate of Michalak*, 404 Ill. App. 3d 75, 96 (2010).

¶ 42      Second, we decide questions of law *de novo*. "[A]n agency's decision on a question of law is not binding on a reviewing court. For example, an agency's interpretation of the meaning of the language of a statute constitutes a pure question of law. Thus, the court's review is independent and not deferential." *Cinkus*, 228 Ill. 2d at 210. The same is true of our interpretation of the Commission's regulations: it is *de novo*. See *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 16.

¶ 43      To be sure, as the supreme court observes, "even where review is *de novo*, [an] agency's interpretation of its regulations and enabling statute are relevant given that agencies make informed judgments on issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent." *Valerio v. Moore Landscapes, LLC*, 2021 IL 126139, ¶ 32. An agency may well have valuable insights into the meaning of its regulations

and enabling statute since it reads and applies them every day. No amount of agency expertise, however, can change the meaning of an unambiguous regulation or statute. If the regulation or statute is ambiguous, the agency, because of its experience and expertise, may well be able to defend its interpretation with cogent reasons. Ambiguity or no ambiguity, however, we interpret statutes and regulations *de novo*, and that means considering the agency's interpretation for whatever inherent merit the interpretation has. In other words, we do not simply defer to the agency's interpretation because of the agency's identity as the agency. Rather, our interpretation of the regulations and statute is "independent and not deferential." *Cinkus*, 228 Ill. 2d at 210. It is impossible to be "independent and not deferential" while being deferential. *Id.*

¶ 44 Third, if the question calls for the application of undisputed law to undisputed facts, we decide whether Commission's resolution of the question is clearly erroneous. See *id.* at 211. "Mixed questions of fact and law," the supreme court explains, "are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." (Internal quotation marks omitted.) *Id.* When reviewing the Commission's resolution of such hybrid questions of law and fact, we defer to the Commission's decision unless we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.*

¶ 45 Finally, there is one further standard of review. If a party contends, on review, that the administrative agency erred in its ruling on the admissibility of evidence, we decide whether the ruling was an abuse of discretion. *Danigeles v. Illinois Department of Financial & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 82. Case law provides several descriptions of a ruling that is an abuse of discretion. The ruling, for example, shows a failure to use "conscientious

judgment." (Internal quotation marks omitted.) *Gruwell v. Department of Financial & Professional Regulation*, 406 Ill. App. 3d 283, 295 (2010). Or the ruling is "clearly against logic." (Internal quotation marks omitted.) *Id.* Or the ruling is "arbitrary or capricious," and "no reasonable person would agree with" it. (Internal quotation marks omitted.) *Sonntag v. Stewart*, 2015 IL App (2d) 140445, ¶ 22.

¶ 46        D. Whether the Carriers Need New or Amended Certificates in Good Standing

in Order to Add Pumping Stations to Their Pipeline

¶ 47        The objectors argue that because the proposed pumping stations were neither repairs nor replacements of the carriers' existing pipelines, section 15-401(a) of the Act (220 ILCS 5/15-401(a) (West 2020)) required the carriers to obtain new or amended certificates in good standing before they legally could install the pumping stations.

¶ 48        To address this argument by the objectors, we must interpret section 15-401(a). Our interpretation is independent, free of deference. See *Cinkus*, 228 Ill. 2d at 210. Section 15-401(a) provides as follows:

"(a) No person shall operate as a common carrier by pipeline unless the person possesses a certificate in good standing authorizing it to operate as a common carrier by pipeline. No person shall begin or continue construction of a pipeline or other facility, *other than repair or replacement of an existing pipeline or facility*, for use in operations as a common carrier by pipeline unless the person possesses a certificate in good standing." (Emphasis added.) 220 ILCS 5/15-401(a) (West 2020).

¶ 49        Because the construction of the proposed pumping stations would be a construction "other than repair or replacement of an existing pipeline or facility," the objectors contend that the

carriers need new or amended certificates in good standing specifically authorizing the carriers to construct the pumping stations. *Id.* By that argument, the objectors read qualifications into the statutory phrase "a certificate in good standing," which, in the text of the statute, lacks any qualification. *Id.* The phrase does not read "a new or amended certificate in good standing to begin or complete the proposed construction project." Rather, the phrase reads simply "a certificate in good standing." *Id.* To quote from the statute again: "No person shall begin or continue construction of a pipeline or other facility, other than the repair or replacement of an existing pipeline or facility, for use in operations as a common carrier by pipeline unless the person possesses a certificate in good standing." *Id.* "If a statutory provision is unambiguous, we must apply it straightforwardly, without reading in exceptions, limitations, or qualifications." *People ex rel. Webb v. Wortham*, 2018 IL App (2d) 170445, ¶ 31. Assuming that pumping stations on a pipeline are "facilit[ies]," the condition in section 15-401(a) to the construction of the facilities is fulfilled: the carriers already possess certificates in good standing. 220 ILCS 5/15-401(a) (West 2020).

¶ 50          "Standing" means "position or condition in society or in a profession," and having a good standing means having a "good reputation." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/standing (last visited Jan. 7, 2022) [https://perma.cc/GP5L-2P3A]. In the text of section 15-401 (220 ILCS 5/15-401 (West 2020)), we see no indication that by proposing to add pumping stations to a pipeline, the possessor of a certificate in good standing loses standing or reputation with the Commission, making it necessary for the disrepute to be purged by a new or amended certificate in good standing. A person either is in good standing with the Commission or is not in good standing with the Commission. Surely, standing does not wax or wane with project proposals. As the carriers observe in their brief, the

legislature has demonstrated in section 8-406(b) of the Act (*id.* § 8-406(b)) that it "[knows] how to require a certificate for each specific project." The legislature, the carriers note, "included no such requirement in [section] 15-401(a)."

¶ 51          It is undisputed that, in addition to possessing certificates in good standing (see *id.*), the carriers had to obtain permission under section 8-503 (*id.* § 8-503) to construct the pumping stations. (Section 15-101 of the Act (*id.* § 15-101) makes sections 8-503 applicable to common carriers by pipeline.) Section 8-503 provides in part as follows:

> "Whenever the Commission, after a hearing, shall find that additions *** or improvements to, or changes in, the existing *** equipment, apparatus, facilities or other physical property of any public utility or of any 2 or more public utilities are necessary and ought reasonably to be made or that a new structure or structures is or are necessary and should be erected, to promote the security or convenience of its employees or the public *** or in any other way to secure adequate service or facilities, the Commission shall make and serve an order authorizing or directing that such additions, *** improvements or changes be made, or such structure or structures be erected at the location, in the manner and within the time specified in said order ***." *Id.* § 8-503.

A "public utility," as defined by the Act, includes every corporation that owns, controls, or operates equipment used for the conveyance of oil by pipeline. *Id.* § 3-105(a)(3). By adding the proposed pumping stations to their pipeline, the carriers, as public utilities, would make "additions *** or improvements to, or changes in," their "existing *** equipment, apparatus, facilities or other physical property." *Id.* § 8-503. Therefore, pursuant to section 8-503, the carriers petitioned for authority to construct the pumping stations.

¶ 52    Insomuch as section 15-401(a) was simultaneously applicable to the pumping-station project, that section already was satisfied. Assuming that a pumping station is a "facility" within the meaning of section 15-401(a), the carriers fulfilled that section's condition to beginning construction of the pumping stations: they possessed certificates in good standing. *Id.* § 15-401(a).

¶ 53    The objectors argue that interpreting section 15-401 as not requiring the carriers to obtain new or amended certificates in good standing before constructing the pumping stations would be "illogical" and would "create[ ] a dangerous precedent." The objectors worry that, "[u]nder this Order [by the Commission], any review of the impact of common carrier projects on public safety, the environment, property, and the economy [could] simply be avoided by not filing under [section] 15-401." Setting to one side the federal preemption in matters of pipeline safety (see 49 U.S.C. § 60104(c) (2018)), the objectors more or less urge us, on public-policy grounds, to overlook the plain language of section 15-401(a) (220 ILCS 5/15-401(a) (West 2020)). Case law warns us against effectively rewriting statutes, in the guise of "interpretation," so as to make the statutes conform to our own notions of optimal public policy. See *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 50; *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 39; *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 220 (1983).

¶ 54    In sum, we hold that section 15-401(a) of the Act (220 ILCS 5/15-401(a) (West 2020)) does not require the carriers to obtain new or amended certificates in good standing in order to construct the proposed pumping stations. The certificates in good standing that they already possess are adequate to that purpose.

¶ 55    E. Whether the Commission's Decision Contains Findings or Analysis
Sufficient to Allow an Informed Judicial Review of the Decision

¶ 56    For a court to evaluate the Commission's decision, the rationale that the Commission used has to be discernable from its decision. If the rationale is obscure, the court should send the decision back to the Commission and order the Commission to explain itself better. As section 10-201(e)(iii) of the Act puts it, "[i]f the court determines that the Commission's *** decision does not contain findings or analysis sufficient to allow an informed judicial review thereof, the court shall remand the *** decision, in whole or in part, with instructions to the Commission to make the necessary findings or analysis." *Id.* § 10-201(e)(iii).

¶ 57    In the objectors' view, the Commission's decision in this case lacks sufficient findings and analysis to make possible an informed judicial review. The objectors make this claim even though the Commission's decision is 80 pages long, single-spaced.

¶ 58    Most of the 80 pages, it is true, is taken up by the Commission's summaries of the parties' opposing positions. For example, under the heading "Need for the Proposed Additional Facilities," the Commission spends 16 pages describing the carriers' position, three-quarters of a page describing the staff's position, 6 pages describing the objectors' position, and a page describing the unions' position. Then the Commission devotes about a page to its own "Analysis and Conclusion." The objectors argue that the findings in the conclusion portions of the Commission's orders (what the Commission has to say) are "distinguishable from" the Commission's preceding summaries of the party's positions (what the parties had to say). The Commission's extensive presentations of the parties' opposing positions, the objectors argue, do not count as the Commission's rationale—which, by comparison, is sparse.

¶ 59    That argument is not entirely convincing. Meaning arises from context. Surely, it would be a mistake to view a conclusion in isolation from the discussion leading up to the conclusion. For an illustration of this point, assume that a trier of fact in a traffic-accident case

- 18 -

writes her decision as follows: "*A* relies on a dash cam video, plaintiff's exhibit No. 1, showing that while *A* had a green light, *B* pulled out in front of him. Also, *A* notes the excessive speed at which *B* was driving, from which *A* infers that *B* was trying to beat the light. *B*, on the other hand, relies on her own testimony and on the testimony of her passenger that she, *B*, had a green light. I find that *B* negligently ran a red light." In that illustration, the trier of fact does not *explicitly* say *why* she finds that it was *B* who ran a red light. It would be natural to infer, however, that if the trier of fact relied on a reason other than the reasons *A* gave or that if the trier of fact disagreed with one of *A*'s reasons, the trier of fact would have said so. If, instead of relying on *A*'s reasons, the trier of fact relied on, say, an external surveillance video from the corner pawn shop, the trier of fact presumably would have so disclosed. Absent some addition or qualification, the natural assumption would be that it was for the reasons that *A* urged that the trier of fact found in *A*'s favor. Maybe the decision would have been better written if the trier of fact had spelled out her rationale. Nevertheless, the context that the trier of fact provided, namely, the summaries of the parties' opposing positions, adequately does the explanatory work. Similarly, in this case, the Commission's summaries of the parties' arguments on both the evidence and the law shed explanatory light on the Commission's conclusions that follow those summaries. See *Ameren Illinois v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140173, ¶ 82 (holding that because the Commission "diligently summarized the parties' arguments and chose among the arguments," its decision contained findings and analysis making possible an informed judicial review).

¶ 60        The objectors complain that the Commission's "order fails to accurately and completely portray [the objectors'] evidence and arguments." It would not follow, however, that the Commission's decision lacked "findings [or] analysis sufficient to allow an informed judicial review" thereof. (Internal quotation marks omitted.) *Id.* If the Commission makes a finding on the

basis of one item of evidence but ignores four other items of evidence, we know why the Commission made its finding—and in an informed judicial review, the Commission's finding is vulnerable to the criticism that it failed to account for the other four items of evidence. Also, if, in its decision, the Commission fails to fairly and accurately state a party's argument, the party's actual argument might go unanswered below, and an informed judicial review might conclude that the party's argument is unanswerable—with reversal as the consequence. If, as the objectors complain, the Commission gives their arguments short shrift; glosses over *Magellan Midstream Partners, L.P.*, 161 FERC ¶ 61, 219 (2017), and *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 440 F. Supp. 3d 1 (D.D.C. 2020); and ignores the policies and positions of Illinois on climate change, those asserted defects in the Commission's decision are reachable by an informed judicial review, without a remand. Indeed, the objectors demonstrate as much in their brief by making their criticisms, which, in the context of the record, are quite intelligible.

¶ 61          We hold, therefore, that the Commission's decision contains findings and analysis sufficient to allow an informed judicial review. See 220 ILCS 5/10-201(e)(iii) (West 2020).

¶ 62          F. Necessity, Reasonableness, and the Security and Convenience of the Public

¶ 63          1. *The Commission's Consideration of the Global Need for Crude Oil*

¶ 64          In deciding whether to authorize an addition to the physical property of a "public utility," which is defined to include the owner of a pipeline (see *id.* § 3-105(a)(3)), the Commission must consider whether the addition is "necessary and ought reasonably to be made" and whether the addition would "promote the security or convenience of its employees or *the public*." (Emphasis added.) *Id.* § 8-503. In its decision on the carriers' proposal to add pumping stations to their pipelines, the Commission deemed itself obligated to consider the needs of the world. The Commission wrote in its decision:

"The Commission should look at the larger group of the general public and determine the regional, national and *even the global needs and benefits. Lakehead Pipeline Co. v. Ill[inois] Commerce Comm'n*, 296 Ill. App. 3d [942,] 955 [(1998)]. Illinois reviewing courts have made it clear that the Commission *must* address this in considering the need and benefits, as opposed to Illinois-specific needs and benefits. See *Pliura [Intervenors] v. Ill[inois] Commerce Comm'n*, 405 Ill. App. 3d [199,] 209 [(2010)]." (Emphases added.)

¶ 65    The objectors do not dispute that "the public," as that term is used in section 8-503, is wider than Illinois and includes the rest of the United States. The objectors contend, however, that it is a misinterpretation of *Lakehead* and *Pliura* to define "the public" as the world.

¶ 66    The Commission cited *Lakehead*, 296 Ill. App. 3d at 955, as direct authority for the proposition that, in determining "the security or convenience of *** the public" (220 ILCS 5/8-503 (West 2020)), the Commission "should *** determine the *** global needs and benefits." *Lakehead*, however, did not so hold. Rather, at the cited page of *Lakehead*, the appellate court held merely that, in determining public need, the Commission should "look at the larger group of the general public to see if it requires the service" instead of considering only the needs of "a few refiners" and "a limited number of market players." *Lakehead*, 296 Ill. App. 3d at 955. By saying that the "general public" was larger than a handful of market players, the appellate court did not suggest that the "general public" was so large as to be the world.

¶ 67    *Pliura*, admittedly, presents a closer question. In that case, the Commission had approved the extension of a pipeline. *Pliura*, 405 Ill. App. 3d at 206. Relying on the discussion of "public need" in *Lakehead*, the Commission had determined as follows: "[T]he pipeline extension would provide (1) Illinois, as well as our nation, additional oil supplies from a friendly ally

[(Canada)] and (2) access to a secure and reliable energy supply that assists our nation in achieving our energy needs, which benefits Illinois citizens either directly or indirectly." *Id.* On appeal, opponents of the pipeline extension argued that the Commission lacked "authority to consider evidence of regional, national, or global benefits when determining whether the public convenience and necessity required issuance of the certificate authorizing the pipeline extension." *Id.* at 208. "We disagree," the appellate court responded. *Id.* Because the Commission had broad authority to interpret statutes that it was charged with administering and because Illinois courts had approved broad interpretations of "the undefined statutory terms 'public need' and 'public convenience and necessity,' " the appellate court was unconvinced that the Commission's interpretation was unreasonable or erroneous. *Id.* at 209.

¶ 68        Judging by the background discussion in *Pliura*, however, the Commission never took the position, in that case, that the "public" meant the world. The Commission *could* be understood, in *Pliura*, as taking the position that the "public" meant the United States as a whole. Even that much is debatable, however, because, according to the Commission's findings, a benefit to the nation would result in a benefit to Illinois citizens—suggesting, perhaps, that a benefit to Illinois citizens was ultimately the germane consideration. *Id.* at 206 (recounting the Commission's determination that "access to a secure and reliable energy supply that assists our nation in achieving our energy needs *** benefits Illinois citizens directly or indirectly"). So, "public" meant the people of Illinois or, in the widest possible significance of the word, the people of the United States.

¶ 69        The appellants in *Pliura* appear to have subjected the Commission's decision to caricature by arguing that the " 'Commission [had to] consider the public need of Illinois citizens, not Midwesterners, [United States c]itizens, *or citizens of the world*.' " (Emphasis added.) *Id.* at

209. From the background in *Pliura*, however, it does not appear that the Commission went so far as to take into account the needs of the world. See *id.* at 206. To this apparently caricatural argument, the appellate court responded, "We disagree"—which, linguistically (it is true), signified that the Commission had "authority to consider evidence of *** global benefits when determining whether the public convenience and necessity required issuance of the certificate authorizing the pipeline extension." *Id.* at 207-08.

¶ 70        Even so, "appellate courts must read cases only in light of the issues brought before the court for determination." *Cates v. Cates*, 225 Ill. App. 3d 509, 511 (1992) (citing *Nix v. Smith*, 32 Ill. 2d 465 (1965)). Or, to put it differently, " '[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.' " *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 41 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)). In *Pliura*, the issue was whether the Commission could take into account the needs of the United States as a whole when determining the public necessity for a pipeline extension, not whether the Commission could take into account the needs of the world. See *Pliura*, 405 Ill. App. 3d at 206. Therefore, *Pliura* is not authority, any more than *Lakehead* is, for the Commission's present holding that, in determining "the security or convenience of *** the public" (220 ILCS 5/8-503 (West 2020)), the Commission "must" address "the global needs and benefits."

¶ 71        The common meaning of the "public" militates against such a holding. When used with reference to persons, the "public" means either "the people as a whole" or "a group of people having common interests or characteristics." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/public (last visited Jan. 7, 2022)

- 23 -

[https://perma.cc/Z7RD-6S7J]. The word "people" in turn means "a group of people who share a quality, interest, etc.," such as "the American *people*." (Emphasis in original.) Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/people (last visited Jan. 7, 2022) [https://perma.cc/BC9V-9NA7]. Human beings the world over do not form a single "people," a single group having common interests or characteristics. Instead, the world is made up of many different peoples, many different publics. We conclude, then, in our *de novo* interpretation of section 8-503 (220 ILCS 5/8-503 (West 2020)), that the Commission erred by regarding itself as obligated, in its evaluation of the carriers' proposal, to take into account "the global needs and benefits." See *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 235 (2005) (holding that "[s]tatutory construction is a question of law, subject to *de novo* review").

¶ 72          Why does it matter that the Commission interpreted the "public" in section 8-503 (220 ILCS 5/8-503 (West 2020)) as meaning the world? It matters because serving the needs of the world does not necessarily serve the needs of the "public," understood as the people of Illinois or the people of the United States. If most of the crude oil passing through the carriers' pipeline is destined for foreign countries, increasing the throughput of the pipeline by installing additional pumping stations would serve the needs of the foreign countries, but the benefit to the "public," properly understood, might be more tenuous. Assume, for example, that most of the crude oil that passes through the carriers' pipelines to the Texas Gulf Coast is, upon arrival, loaded onto tankers and transported to foreign countries, such as China. Doubling the throughput of the carriers' pipelines would benefit Chinese motorists and commuters by making available for them more fuel for their cars, trucks, and buses. In the United States, however, the benefit might be limited mostly to the oil producers in the Bakken region, the carriers, the shippers that use the carriers' pipeline, and the dozens of construction workers who (according to the unions) would be employed in the

building of the pumping stations: "a limited number of market players," as *Lakehead* puts it. *Lakehead*, 296 Ill. App. 3d at 955.

¶ 73        Granted, even if most of the crude oil that passed through their pipeline was bound for foreign countries, the carriers still would have some arguments that increasing the throughput of their pipelines would benefit the American public. First, the inflammable oil would pass through the pipeline instead of through populated areas on trains. Second, railroad tracks would be more available for the transportation of agricultural products. Third, using the pipeline to transport the oil would be cheaper, and would create fewer carbon emissions, than using diesel locomotives. The Commission, however, should weigh those arguments on the basis of a correct understanding of what the "public" is instead of equating the "public" with the world and concluding, perhaps, that "public" need would be served because global need would be served.

¶ 74        In our *de novo* interpretation of section 8-503 (220 ILCS 5/8-503 (West 2020)), we hold that the Commission erred by regarding itself as obligated, in its evaluation of public necessity, to consider "the global needs and benefits." In its broadest sense, the term "public" in section 8-503 means the United States, not the world. "The Commission's findings of fact are *prima facie* correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the statutory authority of the Commission, or violative of constitutional rights." *GlidePath Development LLC v. Illinois Commerce Comm'n*, 2019 IL App (1st) 180893, ¶ 23. We hold that it was beyond the statutory authority of the Commission to treat the world as "the public."

¶ 75        2. *A Lackluster 2019 Open Season and the Durability of the Increased*
            *Demand for Oil Compared to the Long Life of the Pumping Stations*

¶ 76    The objectors represent that, in the 2019 open season, the carriers failed "to secure capacity commitments even before the pandemic." Be that as it may, the carriers informed the Commission that the 2018 season had yielded "long-term contracts," use-or-pay arrangements, "that exceeded the [pipelines'] current [capacity of] 570,000 [barrels per day] by tens of thousands to hundreds of thousands of [barrels per day]." The record does not appear to reveal the duration of these long-term contracts made in 2018, but contracts with a term of only one year could not be aptly characterized as "long-term." It seems reasonable to infer, then, that in 2019, the problem of oversubscription still existed.

¶ 77    Predicting that that the pumping stations would long outlast the subscriptions, the objectors questioned whether "economics *** justif[ied] a project with a multi-decade lifespan." The carriers countered that the risk of those economics would be borne by them, not by ratepayers:

> "[The carriers] *** emphasize that the costs of the additional facilities will not be paid by captive retail ratepayers; rather, the capital investment to construct and install the proposed additional pumping stations and equipment will be funded by [the carriers] and their owners, with the costs to be recovered through charges for transportation capacity and service to their shipper customers."

¶ 78    The economics of a project with a multi-decade lifespan seems, in these circumstances, more of a private concern than a public concern. It is undisputed that the carriers alone will bear the economic risk that, over the long term, the pumping stations will fail to pay off. It also is undisputed that the carriers and several of their shippers are contractually locked into use-or-pay transportation shipping agreements under which, on pain of financial penalties, they are committed to sending greater volumes of crude oil through the pipeline than the pipeline, without the installation of additional pumping stations, can handle.

¶ 79 Therefore, we hold as follows. It would not be a clear error to regard the *economics* of the proposed project as implicating private convenience more than "the *** convenience of *** the public" (220 ILCS 5/8-503 (West 2020)). See *Cinkus*, 228 Ill. 2d at 211. Also, it would not be a clear error to conclude that, at least for the parties to the use-or-pay transportation shipping agreements, "secur[ing] adequate service or facilities" necessitates adding pumping stations to the Illinois pipeline. 220 ILCS 5/8-503 (West 2020); see *Cinkus*, 228 Ill. 2d at 211.

¶ 80 3. *Preemption and the Leak-Detection Limitations of the Pipelines*

¶ 81 The Commission divided its decision into several parts. Part IV was titled "Design, Engineering, and Operations." In part IV, the Commission summarized the objectors' concerns about leak detection. The objectors pointed out that, by the carriers' own admission, a leak from the Illinois pipeline would be detectable by the carriers' technology only if the leak amounted to 1% of the flow rate past a point in an hour. Because the addition of pumping stations would nearly double the flow rate in the pipelines from 570,000 barrels per day to 1,100,000 barrels per day, this limitation in the leak-detection technology was worrisome to the objectors. We quote from part IV of the Commission's decision:

"As [the objectors] note, [the carriers] openly acknowledge that they cannot detect leaks less than 1% of the throughput of the pipelines. [Citation.] This means, by [the objectors'] own calculation, that at a flow rate of 1,100,000 [barrels per day], in one hour 458 barrels of crude oil can escape undetected. Even at the current throughput of 570,000 [barrels per day, the carriers'] witness [Todd] Stamm acknowledges that 237.5 barrels could escape over one hour without detection. [Citation.] With regard to Mr. Klingele's concern with leaks [citation] and his observation that leaked oil can rise to the surface and contaminate farmland, Mr.

Stamm responds, 'Whether leaked crude oil will rise to the surface, and if so within what time period, in a leak at a particular location, will depend on a number of site-specific conditions including soil and rock type and condition at the location, pipeline burial depth, elevation, surface gradient, and other factors.' [Citation.] In other words, according to [the objectors], given [the carriers'] admitted inability to detect 'small' leaks (*i.e.*, leaks that can release 457 barrels, or over 19,000 gallons, in one hour), such a leak could continue for hours or perhaps days undetected by Sunoco *** or anyone at the site if the crude does not rise to the surface due to the circumstances at the site of the leak. The [objectors] find no reassurance in Mr. Stamm's offer that the probability of detecting a small leak 'will increase as the volume imbalances increase.' [Citation.] They note the [the carriers] have not indicated how much time needs to pass before a volume imbalance is detectable. [The objectors] find [the carriers'] lack of concern over these undisputed facts to be shocking."

¶ 82 In *Standing Rock*, the district court took note of the same limitation in Dakota Access's leak-detection system. The Army Corps of Engineers tried to assuage this concern by claiming that "a less-than-1% leak would eventually be detected over an unspecified 'period of time' after building up enough to cause a meter imbalance." *Standing Rock*, 440 F. Supp. 3d at 18. The court found this response to be "less than reassuring given that the amount of undetected leaking oil could be as much as 6,000 barrels per day" (1% of 600,000 barrels per day equaled 6000 barrels per day). *Id.* Moreover, "one of the experts noted that Sunoco had experienced a spill of 8,600 barrels on one of its pipelines when it had not recognized a leak even when there was an 'imbalance indication[ ]' because that imbalance did not exceed 'established normal operating

tolerances.' " *Id.* Even more disquieting, a study in 2012 by the Pipeline and Hazardous Materials Safety Administration found that the type of leak-detection system that Dakota Access used, a computational pipeline monitoring (CPM) leak-detection system, had an 80% failure rate. *Id.* at 17-18.

¶ 83　　　　The same pipeline that was under discussion in *Standing Rock*, with the same leak-detection technology, runs through Illinois. If the district court in *Standing Rock* had reservations about the leak-detection system, so should the Commission, the objectors argued.

¶ 84　　　　The carriers responded that when the objectors referred to the carriers' " 'undisputed inability to detect leaks of less than 1% of throughput,' " the objectors were "grossly misstat[ing] the record." We quote further from the Commission's summary of the carriers' response:

> "[The carriers'] witness testified that the Computational Pipeline Monitoring ('CPM') system is 'set to detect leaks of 1% of flow past a point in an hour.' That does *not* mean that the system won't detect even smaller leaks. To the contrary, 'the probability of detection of a very small leak by the leak detection system will increase as the volume imbalances increase,' meaning that even the tiniest leaks will be detected in time. [Citation.] Moreover, the CPM system is only one piece of a much broader set of leak detection tools. Numerous other components of the leak detection program, including aerial and ground monitoring and other measures, would likely detect a small leak even if it was not immediately detected by the CPM system. [Citation.] The pipelines' leak detection programs are state of the art and fully compliant with safety regulations." (Emphasis in original.)

¶ 85          If the CPM system is set to detect leaks of 1% of flow past a point in an hour, the corollary would be that the CPM system is not set to detect leaks of, say, 0.8% of flow past a point in an hour. For leaks below that threshold, it is necessary to rely on other methods of detecting leaks. Consequently, the sensitivity, reliability, and promptitude of the other methods are of interest. The carriers offered the reassurance that the probability of detecting a "very small leak" would increase as volume imbalances grew and that "even the tiniest leaks [would] be detected in time." The objectors, however, were not reassured, considering that a "very small leak," "the tiniest leaks," "volume imbalances," and "time" were unquantified. Instead of specifying the amount of "volume imbalances" that would catch their attention, the carriers fell back on their regulatory compliance: the leak-detection system was "state of the art" and "fully compliant" with federal regulations.

¶ 86          The Commission represents to us, on appeal, that while the computational pipeline monitoring system is "set to detect leaks of 1% of flow per hour," the "Supervisory Control and Data Acquisition ('SCADA') system *can* alert the control center to even smaller leaks." (Emphasis added.) "Can," however, is a word of possibility, not probability. In the pages of the record that the Commission cites, the carriers' witness, Glenn Emery, testified as follows:

> "Even if a leak were so small (less than 1% of flow in an hour) that it was not immediately detected by the CPM leak detection system or other SCADA monitoring tools, it is highly likely that we would detect the leak well within 30 days by one of several other monitoring means, including hydrocarbon detection within facilities, aerial patrols (conducted once per week, weather permitting), observations by [the carriers'] personnel while on or near the right of way, or observations and calls from the public (an important component of our Public

Awareness and Outreach Programs). Further the probability of detection of a very small leak by the leak detection system will increase as the volume imbalances increase."

"Small" and "very small" are relative terms, especially if the throughput is 1.1 million barrels per day. To put the matter in perspective, 0.9% of 1.1 million barrels per day is 9900 barrels per day, and 9900 barrels per day for 30 days is 297,000 barrels. Thirty days can be a long time, depending on what happens over the 30-day period.

¶ 87    In part IV of its decision, the part of its decision titled "Design, Engineering, and Operations," the Commission first summarized the parties' positions on the leak-detection system. (We have recounted the opposing positions.) Then, at the conclusion of part IV, the Commission set forth the following "Analysis and Conclusion":

> "The Commission notes that the information provided by [the carriers] shows that in the proposed design or engineering of the pumping stations and the subsequent operations of the pumping stations and pipelines, they have taken and will continue to take comprehensive efforts to ensure safe and reliable operation of the pipelines, including at the higher throughput levels after adding the proposed pumping equipment. However, the Commission agrees with Staff that the safety regulation of petroleum pipelines is, as a matter of federal law, within the jurisdiction of the [Pipeline and Hazardous Materials Safety Administration]. The responsibility for safety oversight of hazardous materials pipelines has not been delegated to states, but rather is retained by federal authorities, and inconsistent state requirements are specifically preempted. 49 U.S.C. §§ 5122, 5125; *cf.* 49 U.S.C. § 60105. Therefore, the Commission will not rule on this issue."

¶ 88     The Pipeline Safety Act provides that "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c) (2018). The objectors acknowledge this preemption provision but maintain that it poses no obstacle to their case. They point out that they are not asking the Commission to impose safety standards for the carriers' pipelines "by, for example, requiring thicker pipe walls or lower operating pressures." Instead, the objectors argue, they are asking the Commission to enforce section 15-601 of the Act (220 ILCS 5/15-601 (West 2020)), which, to quote from that Illinois statute, requires "[e]ach common carrier by pipeline" to "construct, maintain, and operate all of its pipelines, related facilities, and equipment in this State in a manner that imposes no undue risk to *** the public."

¶ 89     Assume, hypothetically, that the Commission denies permission to construct the proposed pumping stations and that the Commission justifies the denial by citing the inability of the pipeline's leak-detection system to readily detect a leak of less than 1% of throughput flowing past a point in an hour. Assume, further, that the Commission refrains from prescribing any particular leak-detection system as an alternative. The Commission is convinced, let us say, that the carriers' leak-detection system is state-of-the-art, that no better system is technologically achievable, and that hence it would be meaningless to order the installation of a better system. For that matter, assume that the Commission does not even prescribe any particular sensitivity to leaks, such as 0.8% or 0.6% of throughput—it is just that 1% of throughput is, in the Commission's view, not safe enough. The Commission thereby would adopt a safety standard for the carriers' pipeline: it would be an unspecified leak-detection standard somewhere below 1% of throughput. The Commission effectively would conduct a pipeline safety inspection and would give the carriers a failing grade without revealing how they could pass the inspection. If, because of the limitations

of the leak-detection technology, the Commission denied permission to add the pumping stations, the Commission would fall into essentially the same error as the Iowa Utilities Board in a case cited by the carriers, *Kinley Corp. v. Iowa Utilities Board*, 999 F.2d 354 (8th Cir. 1993). In that case, the Iowa Utilities Board had a pipeline-inspection program, which the federal court held to be preempted. *Id.* at 358.

¶ 90        The United States Supreme Court has held that "[w]hen the [f]ederal [g]overnment completely occupies a given field or an identifiable portion of it, *** the test of pre-emption is whether the matter on which the State asserts the right to act is in any way regulated by the [federal government]." (Internal quotation marks omitted.) *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 212-13 (1983). The federal government has completely occupied the field of oil-pipeline safety. As the Commission rightly perceived, therefore, it would be federally preempted from denying the carriers' petition on the ground that the pipeline, with the addition of the pumping stations, would not be safe enough. See 49 U.S.C. § 60104(c) (2018); *Pacific Gas*, 461 U.S. at 212-13.

¶ 91        The objectors disagree. According to them, "[t]he federal Oil Pollution Act, at 33 U.S.C. § 1321(o) and § 2718, makes clear that a state has authority to consider the risk of releases." That is not exactly what those sections of the federal statute say. Let us start with section 1321(o)(2):

> "(o) Obligation for damages unaffected; local authority not preempted; existing Federal authority not modified or affected
>
> ***
>
> (2) Nothing in this section shall be construed as preempting any State or political subdivision from imposing any requirement or liability

- 33 -

with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge." 33 U.S.C. § 1321(o)(2) (2018).

Section 1321(o)(2) makes clear that states are not preempted from acting *after* oil or any hazardous substance is discharged into state waters. States may "impos[e] any requirement or liability *with respect to the discharge of oil*." (Emphasis added.) *Id.* They may impose penalties for oil spills and may require the spills to be cleaned up. That is not the same as saying, however, that states may impose pipeline safety standards to prevent the discharge of oil.

¶ 92          The same distinction holds true for section 2718(a)(1). That section provides as follows:

"(a) Preservation of State authorities; Solid Waste Disposal Act

Nothing in this Act or the Act of March 3, 1851 shall—

(1) affect, or be interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

(A) the discharge of oil or other pollution by oil within such State; or

(B) any removal activities in connection with such a discharge ***." 33 U.S.C. § 2718(a)(1) (2018).

Again, the principle is that states are not preempted from taking corrective action after an oil discharge. But it does not follow that states may impose pipeline standards to prevent discharges. Such pipeline-safety standards are the exclusive domain of the Pipeline and Hazardous Materials

Safety Administration of the United States Department of Transportation. *See* 49 U.S.C. § 60104(c) (2018).

¶ 93 In sum, federal preemption is a question of law, which we decide *de novo*. *Burgoyne, LLC v. Chicago Terminal R.R. Co.*, 2020 IL App (1st) 190098, ¶ 19. We decide, *de novo*, that the Commission was correct that it was federally preempted from acting on oil-pipeline safety.

¶ 94 <center>4. *Climate Change*</center>

¶ 95 The objectors criticize the Commission for failing to "acknowledge and discuss" Executive Order 2019-6 (Exec. Order No. 2019-6, 43 Ill. Reg. 2192 (Jan. 23, 2019)), in which the Governor of Illinois stated that climate change "must be addressed by public officials" and that the Illinois government "must take action immediately to prevent further impacts of climate change." The objectors further criticize the Commission for failing to "acknowledge and discuss" the brief that Illinois, along with other states, filed in *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, No. 20-5197, 2020 WL 5704517, at *2 (D.D.C. Sept. 23, 2020), in which they argued,

> "[T]oday—in the midst of the devastating effects of a changing climate and increasing awareness that environmental harms are disproportionately borne by our most vulnerable and historically disenfranchised communities—it is more important than ever to fully understand, evaluate, and disclose for public dialogue the environmental effects of major federal actions."

Finally, the objectors criticize the Commission for "entirely ignor[ing] the testimony of renowned climatologist Dr. James Hansen."

¶ 96        In his testimony, Dr. Hansen warned that the proposed project to install the three new pumping stations on the carriers' pipeline would "impact the Earth's climate if approved." He predicted that unless the world phased out fossil fuels and returned the atmospheric concentration of carbon dioxide to no more than 350 parts per million, there would be devastating consequences for human civilization. Great ice masses in Greenland and Antarctica were melting, and if the rate of melting continued to climb exponentially as it was doing now, sea levels would continue to rise, eventually inundating "much of the U.S. eastern seaboard, as well as low-lying areas of Europe, the Indian sub-continent, and the Far East." "[H]undreds of historical coastal cities worldwide" would be underwater, displacing "hundreds of millions of global warming refugees from highly populated low-lying areas" and "likely caus[ing] or exacerbat[ing] major international conflicts." Continued warming of the climate would "yield substantially increased spring precipitation rates in Illinois." Not only that, but Illinois would be overwhelmed by climate-change refugees. Even now, glaciers all around the world were "in full retreat," threatening "[i]nland, fresh-water security." If carbon emissions continued unabated, the subtropics would advance farther north, and there would be increasing evaporation, intensifying droughts, and fiercer wildfires. Acidification of the ocean because of the "uptake of a portion of increased atmospheric [carbon dioxide]" was killing reefs and was "disrupt[ing] ocean ecosystem health, with potentially devastating impacts to certain nations and communities." As climate zones shifted, "the less mobile species [would] be driven to extinction." "According to the United National Intergovernmental Panel on Climate Change ***, with global warming of 1.6°C or more relative to pre-industrial levels, 9-31 percent of species are anticipated to be driven to extinction, while with global warming of 2.9°C, an estimated 21-52 percent of species will be driven to extinction." Children would be hurt most by these cataclysmic effects of climate change.

¶ 97    Dr. Hansen's testimony was sobering—and yet it was as if he were talking past the carriers. The carriers did not dispute the reality of climate change or the threat it posed to civilization. They did not cast doubt on Dr. Hansen's apocalyptic predictions. The carriers' position, instead, was that refusing approval of the additional pumping stations would increase global warming. If the Commission denied approval of the proposed pumping stations, the additional half a million barrels per day of crude oil that the pumping stations otherwise would have transported through the pipelines would not remain in the ground—the carriers wanted to disabuse anyone of that assumption. The technology existed to extract the oil from the Bakken Formation, and the world thirsted for the light sweet crude. Driven by powerful economic incentives, the oil producers or shippers would get the additional half a million barrels per day to the Texas Gulf Coast one way or the other: if not by pipeline, then by rail. Diesel locomotives pulling long trains of oil-filled tanker cars would take the 1500-mile journey from North Dakota to the Gulf Coast, passing through towns and cities. Then, after emptying their cargo of crude oil at the Gulf Coast, the locomotives would make the long journey back to North Dakota, pulling the empty tanker cars. On both legs of the journey, the locomotives would continually emit carbon dioxide into the atmosphere. It was true that, to the extent that the pumping stations did not draw their electricity from wind turbines, they would use electricity from coal-fired power plants, which would emit carbon. But the pumping stations, the carriers argued, would be more energy-efficient than trains, and powering the pumping stations would require fewer carbon emissions. To be sure, the burning of the additional half a million barrels per day of throughput would increase global emissions. The carriers' point, however, was that the worldwide consumption of those half a million barrels per day was going to happen anyway, no matter what. Given that inevitability, they

reasoned, it would be preferable to mitigate the environmental harm by opting for a means of transporting the oil that minimized emissions.

¶ 98        The Commission decided that "adding the additional pumping stations to increase the flow [was] more environmentally friendly than adding additional trucks and railcars to transport the oil." Our standard of review on this question of fact is deferential toward the Commission. See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL App (1st) 150425, ¶ 17. It is not an implausible argument that (1) the additional half a million barrels per day of Bakken crude oil will reach the Texas Gulf Coast or some other destination one way or another, ultimately to be consumed, and (2) transporting the oil by pipeline would be better for the climate than transporting it by train. We hold that by finding those two propositions to be probably true, the Commission did not make a finding that was against the manifest weight of the evidence. See 220 ILCS 5/10-201(d) (West 2020); see *Cinkus*, 228 Ill. 2d at 210.

¶ 99                    5. *Discrimination Between Common Carriers*

¶ 100        The objectors accused the carriers of violating, or of participating in violating, sections 8-101 and 15-401(h) of the Act (220 ILCS 5/8-101, 15-401(h) (West 2020)) and the Interstate Commerce Act (49 U.S.C. § 101 *et seq.* (2018)) by discriminating between users or potential users of their pipeline (or "pipelines," in the plural, if they are thought of as two pipelines joined together). According to the objectors, the discriminatory conduct was twofold. First, the carriers allegedly "entered into agreements under which they sold equity interests in their pipelines contingent upon the equity purchaser also committing to ship crude oil on the pipelines." (We quote from the statements of facts of the objectors' brief.) Second, "if a shipper on [the carriers'] pipelines lack[ed] an investment grade credit rating, the [carriers] require[d] the shipper to provide credit enhancement, which [might] take the form of a parent guaranty or other satisfactory form of

financial assurance." The carriers' " 'affiliated shippers," on the other hand, "ha[d] received parent guarantees from their parent companies (including [the carriers'] parent) to enable the affiliates to ship on the pipelines." According to the objectors, this discriminatory treatment of shippers—providing credit enhancement to some of the shippers and requiring other shippers to provide their own credit enhancement—violated *Magellan*. On the authority of *New York, New Haven & Hartford R.R. Co. v. Interstate Commerce Comm'n*, 200 U.S. 361, 402 (1906), the objectors argue that contracts that violate the interstate commerce clause (U.S. Const., art. I § 8) are void and unenforceable. By the objectors' reasoning, the allegedly discriminatory provisions in the transportation shipping agreements "undercut[ ] the validity of [these agreements that the carriers] rely upon to justify their claim of need." In other words, if the transportation shipping agreements are illegal and void because they contain discriminatory provisions, the agreements, being legal nullities, really do not generate a need for increased throughput.

¶ 101        Let us assume, for the sake of argument, that some of the provisions in the transportation shipping agreements violate the anti-discrimination policy of state and federal law. It would not necessarily follow that the transportation shipping agreements are, as the objectors assert, void. Just because the contracts in *New Haven* were void, it does not follow that *every* contract containing an illegal provision is void. The appellate court has explained:

> "[W]hen some portion of a contract is unenforceable as against public policy, a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange. [Citations.] The rationale for this rule is that complex, multipart agreements on which there may have been significant reliance should not be void as a whole solely because some

small part is against public policy [citation] because, absent great inequality or misconduct involving an essential term of the contract, doing so would frustrate the contractual expectations of the parties. [Citation.] Thus, the initial inquiry as to the issue of severability is whether the unenforceable term is an essential part of the contract. [Citation.] If the unenforceable term is an essential part of the contract, the contract is not severable and the entire contract is void. [Citations.] Whether the unenforceable term is an essential part of the contract depends on the relative importance of the term in light of the entire agreement between the parties. [Citations.]" *Kepple & Co. v. Cardiac, Thoracic & Endovascular Therapies, S.C.*, 396 Ill. App. 3d 1061, 1066 (2009).

¶ 102     The objectors do not argue that the offending provisions of the transportation shipping agreements are, to the contracting parties, indispensable and inseverable. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). To reiterate a crucial point, our default position, from which we begin, is that the Commission's decision is reasonable, and the burden is on the objectors to make arguments that are persuasive enough to move us from that position. See 220 ILCS 5/10-201(d) (West 2020). Arguably, an inference could be drawn that because the parties to the transportation shipping agreements were, presumably, sophisticated players in the oil industry, they were just as aware as the objectors that some of the provisions in the agreements could be challenged as discriminatory. Nevertheless, these savvy market players entered into the agreements anyway. It could be that, to them, the questionable provisions, though desirable, were inessential and that the business relationship would not rise or fall on these provisions. We are unaware of any evidence that, in light of *Magellan*, any of the shippers have

backed out of the transportation shipping agreements or have threatened to do so. As the Commission notes in its brief, the carriers "could revise the credit policy to provide that parent guarant[e]es are not acceptable credit support for shippers that do not have investment-grade credit ratings, and any such shippers must provide credit enhancement from third parties." The record before us provides no basis to conclude that such a revision would be, in the view of any of the contracting parties, fatal to the transportation shipping agreements.

¶ 103        Assuming, then, that some of the provisions of the transportation shipping agreements are illegally discriminatory as the objectors claim, we hold that the objectors have failed to show that the provisions are inseverable. Having failed to make that showing, the objectors have failed to undercut the carriers' reliance on the transportation shipping agreements as proof that the additional pumping stations are necessary.

¶ 104        6. *Sunoco's Operation of Pipelines in Pennsylvania*

¶ 105        In a motion on August 20, 2019, the objectors argued that, in view of operational problems with the Mariner East pipelines in Pennsylvania, the Commission should investigate whether the carriers' pipeline in Illinois would be prone to the same problems. About a month before the objectors made that motion, the carriers represented to them, in a discovery answer, that DAPL-ETCO Operations Management, LLC, was the entity responsible for maintaining and operating the carriers' Illinois pipeline. A different entity, Sunoco, an affiliate of the carriers, was the operator of the Mariner East pipelines in Pennsylvania. The administrative law judge denied the request for an investigation of the Pennsylvania pipelines.

¶ 106        Afterward, on October 22, 2019, the objectors obtained from the carriers some operational and safety documents. From those documents, the objectors learned that the operator

of the carriers' Illinois pipeline was, actually, Sunoco—the same entity that operated the Mariner East pipelines in Pennsylvania.

¶ 107    The subject of Sunoco came up in an evidentiary hearing on March 13, 2020, when counsel for the objectors cross-examined Stamm, the vice president of liquid pipelines operations for Energy Transfer, L.P., which was Energy Transfer's primary parent. Counsel for the objectors posed to Stamm the question of who was the operator of the carriers' pipeline in Illinois. "Sunoco Pipeline, L.P., is the operator," he answered. Counsel then handed Stamm some press releases from the Commonwealth of Pennsylvania Department of Environmental Protection and asked him, "Are you aware that *** the Department of Environmental Protection issued in 2018 fines for $355,000 for Mariner East 2 violations?"

¶ 108    The carriers' attorney objected, arguing that by declining, earlier, to investigate the alleged problems with the Pennsylvania pipeline, the Commission already had ruled that this line of inquiry was irrelevant.

¶ 109    The objectors' attorney countered that, at the time the Commission declined the recommended investigation, "we didn't know who *** that actual operator was of the pipelines." Not until afterward, the objectors' attorney explained, did the objectors learn, through discovery, that DAPL-ETCO Operations Management, LLC, "had essentially subcontracted the operational work to Sunoco."

¶ 110    The carriers' attorney remarked that this line of inquiry could oblige him to bring in evidence of how well Sunoco had managed thousands of miles of pipelines in other states. "[W]e're going to be here for a month," he warned.

¶ 111 The objectors' attorney responded, "Well, Your Honor, I mean if they want to recognize that they followed the rules elsewhere, that's fine. You know, I'm concerned about when they don't follow the rules."

¶ 112 Administrative Law Judge Dolan ruled, "I'm going to sustain the objection because I really don't think this is relevant to this actual pipeline."

¶ 113 Under section 200.520 of the Commission's rules (83 Ill. Adm. Code 200.520 (2011)), a party could petition the Commission for interlocutory review of a hearing examiner's ruling. (Another name for a hearing examiner is an administrative law judge.) The petition was to include "any offer of proof" and was to be served on the hearing examiner, the staff, and all other parties. *Id.* § 200.520(a). The hearing examiner, if he or she wished, could "provide a written explanation for ruling." *Id.* On review of the hearing examiner's ruling, the Commission could affirm the ruling or could reverse it in whole or in part. *Id.* § 200.520(b). Or the Commission could "take any other just and reasonable action with respect to the ruling, such as declining to act on an interlocutory basis." *Id.*

¶ 114 On March 13, 2020, pursuant to section 200.520, the objectors petitioned to the Commission to review Administrative Law Judge Dolan's ruling that Sunoco's performance as a pipeline operator in Pennsylvania was irrelevant. The objectors argued that because Sunoco was the operator of the carriers' Illinois pipeline, refusing to allow the objectors to inquire into, and to offer evidence regarding, Sunoco's past performance as a pipeline operator in Pennsylvania was prejudicial to them and deprived the Commission of information relevant to an important question: whether nearly doubling the throughput of the Illinois pipeline would be in the public interest and would be consistent with the security of the public.

¶ 115    In their petition for interlocutory review, by way of an offer of proof (see *id.* § 200.520(a)), the objectors cited decisions, orders, and press releases by governmental agencies in Pennsylvania as well as an article from a business publication, providing hyperlinks or Internet addresses in footnotes of their petition. According to the petition, these materials showed the following:

> "Publicly available information *** indicates that Sunoco's activities related to [the Mariner East 1 and Mariner East 2] pipelines have been plagued with problems, including many that resulted in fines as well as an order by the [Department of Environmental Protection] to halt work until 'egregious and willful violations' were corrected. Among other things, Sunoco committed violations based on its repeated failure to comply with Pennsylvania state law and permit conditions, repeated discharge of drilling fluids into state waters, adverse impacts on private drinking water supplies, and repeated failure to report discharges. Individual [Department of Environmental Protection] fines assessed on Sunoco have been as high as $12.6 million, which certainly denotes the seriousness of Sunoco's transgressions.

> 7. Sunoco's violations in Pennsylvania are not limited to its Mariner East 2 project. In late 2019, the [Department of Environmental Protection] ordered Sunoco to cover exposed pipelines at over 40 locations within Pennsylvania. None of the exposed pipelines were located at active construction areas.

> 8. More recently, in February of this year, the Pennsylvania Public Utility Commission *** fined Sunoco $200,000 for a leak of propane and ethane on the Mariner East 1 pipeline caused by corrosion and directed Sunoco to conduct an independent remaining life study on that pipeline.

9. In addition, late last year the Associated Press reported that the Federal Bureau of Investigation *** is investigating the Pennsylvania state government's issuance of permits to Sunoco.

10. As we finally discovered from [the objectors'] efforts in discovery, the Sunoco entity in Pennsylvania is the same entity operating [the carriers'] pipelines in Illinois."

¶ 116 In a teleconference on April 1, 2020, the Commission considered the objectors' petition for interlocutory review. Commissioner Kimbrel pointed out that the pipelines in Pennsylvania, unlike the Illinois pipeline, were "80 and 90 years old." Also, he observed that the carriers in this case had received certificates of fitness and that oil had been flowing through their Illinois pipeline since 2017. For those reasons, he voted to deny the petition for interlocutory review. Commissioners Carrigan and Oliva likewise voted to deny the petition. Chairman Zalewski and Commissioner Bocanegra, on the other hand, voted to grant the petition. Commissioner Bocanegra had no opinion one way or the other on relevancy. She thought that evaluating relevancy was premature and that the objectors should have been allowed to cross-examine Stamm on Sunoco's performance as a pipeline operator in Pennsylvania and to offer additional proof to demonstrate the relevancy of their questions. Chairman Zalewski filed a written dissent, in which she argued that "when the pipeline's safety is of utmost importance, due diligence require[d] the Commission to evaluate the entirety of a pipeline operator's safety record."

¶ 117 So, the Commission was divided on the admissibility of this evidence of Sunoco's regulatory violations in Pennsylvania. On appeal, the carriers defend the ruling by the majority of the Commission. The carriers argue that, "at the time of the [administrative law judge's] ruling, [the objectors] failed to make an offer of proof (as provided for in the [Commission's] Rules of

Practice, 83 Ill. Adm. Code 200.690) of the testimony it sought to elicit and the cross exhibits it sought to offer, thereby waiving appellate review of the ruling."

¶ 118 Section 200.690 of the Commission's rules does not say, however, that an offer of proof must be made at the time of the administrative law judge's ruling. All section 200.690 says is that "[a]ny party or staff witness who has had evidence excluded may make an offer of proof." It does not specify when the offer of proof must be made.

¶ 119 Another rule, section 200.520(a), says that the offer of proof may be provided later, in a petition to the Commission for interlocutory review of the administrative law judge's ruling. See 83 Ill. Adm. Code 200.520(a) (2011). That section reads as follows: "The petition shall be filed with the Chief Clerk *together with any offer of proof* and shall be served upon the Hearing Examiner and upon staff and all parties to the proceeding." (Emphasis added.) *Id.* We interpret administrative regulations the same way we interpret statutes (*Dusthimer v. Board of Trustees of the University of Illinois*, 368 Ill. App. 3d 159, 165 (2006)), without imposing any "exceptions, limitations, or conditions" unexpressed in the text (*In re Marriage of Zamudio*, 2019 IL 124676, ¶ 15). Section 200.520(a) (83 Ill. Adm. Code 200.520(a) (2011)) plainly states that the petition for interlocutory review shall include "any offer of proof." The regulation does not state that the petition shall include an offer of proof *on condition that* the offer of proof first was made to the administrative law judge. We decline to effectively rewrite the regulation by reading that condition into it. See *Zamudio*, 2019 IL 124676, ¶ 15.

¶ 120 The petition for interlocutory review that the carriers filed on March 13, 2020, after the administrative law judge ruled Sunoco's performance in Pennsylvania to be irrelevant, included an offer of proof, with hyperlinks. It is true that the offer of proof did not speculate how Stamm would have answered the question that was put to him on cross-examination. In their offer

of proof, however, the objectors presented decisions, orders, and press releases by governmental agencies in Pennsylvania as well as an article from a business publication. If the administrative law judge had not ruled Sunoco's regulatory violations in Pennsylvania to be irrelevant, the objectors could have requested him to take judicial notice of the governmental records, regardless of whatever answers Stamm would have given on cross-examination. See *City of Chicago v. Soludczyk*, 2017 IL App (1st) 162449, ¶ 3 (holding that judicial notice may be taken of information on a governmental website). Even the business publication, though hearsay, would have been admissible if it was evidence "of a type commonly relied on by reasonably prudent [persons] in the conduct of their affairs." 5 ILCS 100/10-40(a) (West 2020); 83 Ill. Adm. Code 200.610(b) (2000). We are unconvinced, then, by the carriers' and Commission's assertion that the objectors failed to make an offer of proof.

¶ 121　　　　Having addressed the procedural question of whether the objectors made an offer of proof, we turn now to the underlying substantive question: Was the evidence of Sunoco's regulatory violations as a pipeline operator in Pennsylvania relevant? Section 200.610(b) of the Commission's rules (*id.* § 200.610(b)) provides that, "[i]n contested cases, *** the rules of evidence *** applied in civil cases in the circuit courts of the State of Illinois shall be followed." The Illinois Rules of Evidence "govern proceedings in the courts of Illinois." Ill. R. Evid. 101 (eff. Jan. 1. 2015). Under Illinois Rule of Evidence 402 (eff. Jan. 1, 2011), "[a]ll relevant evidence is admissible, except as otherwise provided by law," and all irrelevant evidence is inadmissible. " 'Relevant evidence' " is defined as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.) Ill. R. Evid. 401 (eff. Jan. 1, 2011). We do not decide *de novo*—that is, we do not decide anew—whether Sunoco's performance as a pipeline

operator in Pennsylvania was relevant. Instead, we decide whether the Commission abused its discretion by excluding the evidence as irrelevant. See *Schachter v. City of Chicago*, 2011 IL App (1st) 103582, ¶ 52. "An abuse of discretion is found when a decision is reached without employing conscientious judgment or when the decision is clearly against logic." (Internal quotation marks omitted.) *Gruwell*, 406 Ill. App. 3d at 295.

¶ 122　　　　It was clearly against logic to rule that Sunoco's performance as a pipeline operator in Pennsylvania had no relevance to the question of public safety. The question facing the Commission was whether nearly doubling the throughput of the Illinois pipelines by the construction of additional pumping stations would "promote the security of *** the public." See 220 ILCS 5/8-503 (West 2020). "Security" means "the state of being protected or safe from harm." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/security (last visited Jan. 7, 2022) [https://perma.cc/G8Z3-2DP3]. Although the safeness of the pipeline, as we have discussed, was federally preempted, the safeness of the pipeline operator was not federally preempted. That Sunoco repeatedly was fined in Pennsylvania for violating public safety rules pertaining to the operation of pipelines, including rules against discharges, has *some* tendency to move the needle of probability on the question of public safety. See Ill. R. Evid. 401 (eff. Jan. 1, 2011). To deny that it has *any* such tendency is untenable. After all, in its brief, the Commission cites evidence that Sonoco's performance as a pipeline operator greatly improved after Sunoco came under the supervision of Energy Transfer, L.P. While touting the evidence of Sunoco's good performance, it is arbitrary to reject, as irrelevant, the evidence of Sunoco's not so good performance.

¶ 123　　　　Granted, the pipelines that Sunoco operated in Pennsylvania were older than any portion of the pipeline in Illinois, and the pipelines in Pennsylvania transported ethane and

propane, whereas the pipeline in Illinois transported crude oil. And granted, the circumstances in which Sunoco let the spills happen in Pennsylvania might differ from the circumstances in Illinois. Maybe such differences would be worth taking into consideration—but they would not make Sunoco's violations in Pennsylvania *irrelevant* or entirely lacking in probative value. If, as the objectors wanted to prove, Sunoco had a corporate culture that was less than scrupulous about obeying environmental regulations relating to the operation of pipelines, such evidence, if true, would have *some* tendency to lessen confidence in Sunoco as a safe operator of the Illinois pipeline and, therefore, would have *some* tendency to lessen the probability that nearly doubling the throughput of the Illinois pipeline would be consistent with the security and convenience of the Illinois public. See 220 ILCS 5/8-503 (West 2020); Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 124　　　　On appeal, the Commission represents that "[a]s to Sunoco's operating record, both [the objectors] and [the carriers] introduced a significant amount of evidence related to Sunoco's operating history." Be that as it may, the administrative law judge ruled that such evidence was irrelevant—at least when it came to Sunoco's performance in Pennsylvania—and apparently, a majority of the Commission agreed. Ruling evidence to be irrelevant is to reject it or to exclude it from consideration. Under Illinois Rule of Evidence 402 (eff. Jan. 1, 2011), "[e]vidence which is not relevant is not admissible."

¶ 125　　　　Section 10-201(e)(ii) of the Act provides as follows:

"If it appears that the Commission failed to receive evidence properly proffered, on a hearing or a rehearing, or an application therefor, the court shall remand the case, in whole or in part, to the Commission with instructions to receive the testimony so proffered and rejected, and to enter a new order based upon the evidence theretofore taken, and such new evidence as it is directed to receive, unless it shall appear that

- 49 -

such new evidence would not be controlling, in which case the court shall so find in its order." 220 ILCS 5/10-201(e)(ii) (West 2020). The Commission argues that, under this section, the objectors "bear[ ] the burden on appeal to establish that the '*evidence*' it '*properly proffered*' was '*controlling*,' *i.e.*, outcome determinative." (Emphases in original.) But that is not an entirely accurate account of section 10-201(e)(ii). Nowhere does that section say that the proponent of the rejected evidence has the burden of establishing, on appeal, that the evidence would have been controlling. Instead, section 10-201(e)(ii) says that if, in a hearing or in an application for a hearing, a party properly proffers evidence and the Commission fails to receive the evidence, the case is to be remanded with instructions to enter a new order on the basis of the record augmented by the rejected evidence, "unless it shall appear that such new evidence would not be controlling, in which case the court shall so find in its order." *Id.* That is far from saying that the proponent of the rejected evidence bears the burden of proving to us that the evidence was controlling. Rather, unless the record enables us to make a finding that the rejected evidence was not controlling, *i.e.*, would not have changed the outcome, section 10-201(e)(ii) requires a remand for a new order by the Commission, with the rejected evidence taken into account. See *id.*

¶ 126      Because statutes are to be interpreted reasonably and with a view to avoiding absurdity (*LOMTO Federal Credit Union v. 6500 Western LLC*, 2018 IL App (1st) 173106, ¶ 28), we presume the legislature did not intend us to speculate as to the subjective mental processes of individual commissioners and try to predict how each would vote when, on remand, the rejected evidence is added to the mix. More likely, the legislature intended us to use a standard of objective reasonableness when deciding whether the record justifies a remand-avoiding conclusion. We are to ask, would all reasonable minds necessarily have reached the same decision as the Commission

had they considered the rejected evidence in the context of the other evidence? We are unable to so conclude with respect to Sunoco's performance as a pipeline operator in Pennsylvania, especially in the light of the evidence that (1) leaks of less than 1% of the throughput of the carriers' Illinois pipeline are not readily detectable and (2) how soon such leaks are detected or whether they are detected at all depends largely on the vigilance and diligence of the pipeline operator.

¶ 127          In sum, therefore, we hold that rejecting, as irrelevant, the proffered evidence of Sunoco's regulatory violations as a pipeline operator in Pennsylvania was an abuse of discretion necessitating a remand for consideration of the rejected evidence.

¶ 128          7. *The Effect of the COVID-19 Pandemic on the Global Demand for Oil*

¶ 129          Section 200.500 of the Commission's rules (83 Ill. Adm. Code 200.500 (1986)) delineates the authority of the hearing examiner, otherwise known as the administrative law judge. Section 200.500(e) provides as follows:

> "The Hearing Examiner shall have authority over the conduct of a proceeding and the responsibility for submission of the matter to the Commission for decision. The Hearing Examiner shall have those duties and powers necessary to these ends, consistent with applicable statutes and Commission rules and policies, including the following:
>
> * * *
>
> (e) At any stage of the hearing or after all parties have completed the presentation of their evidence to call upon any party or the Staff of the Commission to produce further evidence which is material and relevant to any issue." *Id.* § 200.500(e).

¶ 130        On March 5, 6, and 9, 2020, Administrative Law Judge Dolan heard evidence. On March 26, 2020, before briefs were filed, the objectors moved, pursuant to section 200.500(e), that the administrative law judge stay the proceedings and take additional evidence, specifically, evidence on the impact that the COVID-19 pandemic was having on global oil markets. The objectors reminded the administrative law judge that, not too long ago, to support their own claim that nearly doubling the throughput of their pipelines was necessary, the carriers cited production increases in the Williston Basin and petroleum product consumption statistics.

¶ 131        Relying now on similar kinds of data, the objectors noted that the pandemic had caused the price of crude oil to drop precipitously, indicating a sharp decline in public demand. On June 14, 2019, when the carriers filed their joint petition to install the additional pumping stations, the benchmark price of West Texas Intermediate crude oil was $52.51 per barrel. On March 25, 2020, it was $24.12 per barrel. On June 14, 2019, the price for North Dakota Williston sweet crude oil was $40.75 per barrel. On March 24, 2020, it was $13 per barrel. (The objectors represented that they had obtained these prices from "oilprice.com reports.")

¶ 132        The objectors summarized a recent article by Ellen R. Wald, *Russia Will Beat Saudi Arabia in This Oil Price War*, Forbes (Mar. 9, 2020), https://www.forbes.com/sites/ellenrwald/2020/03/09/russia-will-beat-saudi-arabia-in-this-oil-price-war/?sh=30393d3314a6 [https://perma.cc/7FC6-WMG4]:

> "9. Among the sectors hit hard by the global economic slowdown is the oil industry. Significantly decreased refined petroleum product consumption has resulted in much greater supply than demand. During the week of March 2, 2020, the Organization of the Petroleum Exporting Countries ('OPEC') and other non-member countries, which include Russia, attempted to come to an agreement to cut

crude oil production in order to prevent further declines in oil markets. This effort failed. Immediately thereafter, Saudi Arabia reduced the price of its oil in certain markets and signaled that it may increase production as well. As a result, global crude oil prices crashed, including the price paid for North Dakota crude oil. Oil markets have continued an unprecedented decline since these events."

¶ 133 Also, the objectors attached to their motion an article by Amy Kalt, *Strange Brew— COVID 19 and the Crude Oil Price Crash Puts the Screws on U.S. Refiners*, RBN Energy LLC: Daily Blog (Mar. 23, 2020), https://rbnenergy.com/strange-brew-covid-19-and-the-crude-oil-price-crash-puts-the-screws-on-us-refiners [https://perma.cc/9NRH-HMV2]. They summarized Kalt's article as follows:

"10. Oil industry experts report that refinery utilization is declining due to decreased demand for refined products, and that refineries in PADD II (the Midwest) are particularly sensitive to downturns in retail petroleum product consumption. Reduced demand for refined products translates into reduced refinery utilization rates, thereby reducing the need for crude oil, and correspondingly reduced need for crude oil shipments and shipping capacity."

¶ 134 The objectors observed that the pandemic-related drop in oil prices had "led to a new North Dakota state record for inactive wells, because continued production [was] uneconomic." This lack of demand had put operators in a predicament: they either could abandon the oil well, "making its transfer to a new operator difficult," or they could "bring the well into production," which hardly would be economic, given the low prices for crude. (Here the objectors cited Brian Scheid, *North Dakota Weighs Plan to Keep Some Bakken Crude Off Market*, S&P Global (Mar. 18, 2020), https://www.spglobal.com/platts/en/market-insights/latest-news/natural-

gas/031820-north-dakota-weighs-plan-to-keep-some-bakken-crude-off-market

[https://perma.cc/D537-Q7RM].) The objectors pointed out that the situation in North Dakota was dire enough that on March 24, 2020, the North Dakota Industrial Commission, in an effort to prevent additional crude oil production, "took steps to discourage" oil producers from bringing wells into production. (Here the objectors cited Amy R. Sisk, *State to Revive Waivers to Extend Duration of Idled Wells Amid Low Oil Prices*, Bismark Tribune (Mar. 25, 2020), https://bismarcktribune.com/bakken/state-to-revive-waivers-to-extend-duration-of-idled-wells/article_f5abf5f9-af37-5cbb-acc1-e61022e88625.html [https://perma.cc/EFM9-X267].)

¶ 135　　　　The carriers opposed the objectors' motion to stay the proceedings and to take additional evidence. The motion was misguided, the carriers argued, because it was premised on "a *short-term* uncertainty in global markets caused by the COVID-19 crisis and an 'oil price' war between Russia and Saudi Arabia." (Emphasis in original.) The proposed pumping stations, by contrast, were a "long-term investment being built to satisfy *long-term* demand." (Emphasis in original.)

¶ 136　　　　The carriers reminded the Commission that on June 14, 2019, and again on January 17, 2020, Emery cited forecasts that Bakken oil production was expected to increase by 350,000 to 450,000 barrels per day over the next five years. The sources on which Emery said he had relied were the United States Energy Information Administration, the North Dakota Industrial Commission, Enverus, and Wells Fargo.

¶ 137　　　　After those agencies and institutions made their predictions, the pandemic happened. Even so, the carriers maintained, the grounds of the objectors' motion were "speculative and fleeting." The pandemic, the carriers argued, was only temporary—a transient condition—and the pumping stations would long outlast the pandemic. The carriers continued:

- 54 -

"Once the Nation emerges from the COVID-19 restrictions, it will need all available options, including those related to transportation and refinement of crude oil, for returning the economy to its pre-pandemic levels as quickly as possible. Thus, there is no reason to reopen the record in this case to take speculative evidence on the projected short-term impacts that current events may have on crude oil demand."

¶ 138 In fact, the carriers and shippers had been so confident of continuing global demand for oil over the long term, despite inevitable fluctuations in the market, that they had locked themselves into long-term transportation shipping agreements. The carriers argued:

"The unrefuted record shows that shippers have entered into long-term contracts with [the carriers] for transportation contracts and service on the [carriers'] pipelines that *already* exceed the pipelines' current achievable maximum daily throughput by *** approximately 142,000 [barrels per day], or 25% ***. This is public demand for service, pursuant to long-term contracts, that the pipelines, as interstate common carrier pipelines, *are unable to serve today*. The proposed additional pump stations and pumping facilities are *required* to enable the pipelines to serve this demand, even without any future growth in crude oil production in the Bakken/Williston region. These same improvements will enable the pipelines to transport up to 1.1 million [barrels per day] of crude oil, thus enabling the pipelines to meet additional long term future demand. These facts alone establish that the proposed improvements will secure adequate service and facilities, promote the security and convenience of the public, are needful and useful to the public, and

satisfy the requirements for granting [the carriers] authorization under § 8-503 of the *** Act to proceed to install the additional facilities." (Emphases in original.)

¶ 139    As a matter of fact, as if to underline their commitment and their confidence in the market, the carriers pointed out that, without the additional pumping stations, they would end up being in breach of contract or incurring contractual penalties. They represented to the Commission:

"[B]ecause these [transportation shipping agreements] are already in place, [the carriers] are contractually obligated to meet the demand and provide the transportation capacity the shippers have contracted for in the [transportation shipping agreements]. Indeed, by citing the 'take or pay' provisions in these [transportation shipping agreements, the objectors] recognize that [the carriers] will be forced to compensate shippers if [the carriers] cannot perform their contractual obligations."

¶ 140    The carriers summed up:

"The Commission must make a determination that is more forward-looking than contemplated by [the objectors'] motion. The COVID-19 pandemic and current Russia-Saudi Arabia interactions have caused *short-term* uncertainty in global oil markets. In contrast, [the carriers'] proposed $190 to $200 million (*in Illinois*) capacity optimization project is a substantial investment intended to ensure that [the carriers'] pipelines can meet shipping demands many years into the future, not just for the next few months or even the next couple of years. The current short-term situations do not alter the factors relevant to these longer-term needs that the proposed pumping stations help to address." (Emphases in original.)

¶ 141     On April 23, 2020, Administrative Law Judge Dolan denied the objectors' motion for a stay and for the taking of additional evidence. His order stated, "While the Commission notes that the current crisis and the oil [*sic*] certainly will lead to some questions about future needs, at this point granting a stay in this proceeding would be based on speculation."

¶ 142     The objectors filed a petition for interlocutory review, providing additional information on the downturn in production at the Bakken oilfields. On October 14, 2020, the Commission denied the petition for interlocutory review, without explanation.

¶ 143     The Commission's decision of October 14, 2020, does not mention the COVID-19 pandemic.

¶ 144     On November 13, 2020, the objectors applied for a rehearing to consider the Bakken production downturn and its negative implications for public need of additional transportation capacity on the pipelines. On December 2, 2020, the Commission denied rehearing, again without explanation.

¶ 145     The supreme court has stated that an "[a]gency action is arbitrary and capricious if the agency *** entirely fails to consider an important aspect of the problem." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988). The COVID-19 pandemic, the objectors argue, was important to the question of whether the public needed a nearly doubled throughput capacity in the carriers' pipeline, and it was arbitrary and capricious of the Commission to refuse to consider evidence of how, since the hearings in early March 2020, the pandemic had sharply reduced the public demand for oil.

¶ 146     Evidently, though, the Commission *did* consider the evidence that the objectors proffered in their "Verified Motion to Stay the Proceeding and Take Additional Evidence." To quote Administrative Law Judge Dolan again: "While the Commission notes that the current crisis

and the oil [*sic*] certainly will lead to some questions about future needs, at this point granting a stay in the proceeding would be based on speculation." To arrive at the very conclusion that the objectors had wanted him to reach—that the pandemic "certainly" put into question "future needs" for increased oil production—the administrative law judge would have had to consider and evaluate the evidence that the objectors had cited and hyperlinked in their motion for a stay. Apparently, Administrative Law Judge Dolan did not *reject* this evidence. Rather, he weighed it, acknowledged what it showed, and decided that it did not warrant a stay of the proceedings.

¶ 147   Granting or denying a stay is a discretionary act that is reversible only for an abuse of discretion. *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 65. A reasonable person could take the view that the stay requested by the objectors was unnecessary. After all, the objectors presented, with their petition for a stay, a variety of evidence on the pandemic-related downturn in the oil industry. Although much of this evidence was hearsay, it was not objected to. And, besides, under the Commission's rules, hearsay was admissible if the evidence was "of a type commonly relied on by reasonable prudent persons in the conduct of their affairs." 83 Ill. Adm. Code 200.610(b) (2000). The evidence that the objectors presented in their motion for a stay seemed to be of that type, *e.g.*, articles from oil-industry publications and from a reputable newspaper and business magazine. Evidence could "be received *** in writing" (*id.*), and the Commission could have decided that the written evidence the objectors had presented was adequate to make their point and that a stay, therefore, would be unnecessary. Again, the administrative law judge agreed with the objectors that the pandemic had put the projected growing need for oil in brackets. The Commission also could have taken the carriers' point that pandemics did not last forever and that the pumping stations, if they were approved, would be in operation long after the pandemic receded and the global demand for oil rebounded.

¶ 148　　　　　Arguably, then, the competing positions on fluctuation in oil demand were adequately presented on both sides. "Your points are taken, and a stay is unnecessary" could have been the Commission's reasonable response. We find no abuse of discretion in the denial of the objectors' motion for a stay.

¶ 149　　　　　　　　　　　　　　　III. CONCLUSION

¶ 150　　　　　For the reasons set forth in this opinion, we vacate the Commission's decision, and we remand this case to the Commission for a new decision. We express no view, one way or the other, whether permission to construct the pumping stations should be granted. That is solely for the Commission to decide. We direct, however, that, in making its new decision, the Commission regard the "public" in section 8-503 of the Act (220 ILCS 5/8-503 (West 2020)) as being, at its broadest, the people of the United States, not the world. Also, we direct that the Commission take into consideration Sunoco's regulatory violations in Pennsylvania. On remand, however, in accordance with section 10-201(e)(ii) of the Act (*id.* § 10-201(e)(ii)), the Commission shall rely on the evidence already in the record and shall receive no new evidence beyond that cited in the objectors' petition for interlocutory review of March 13, 2020. We deny the objectors' request that, on remand, we order the Commission to issue a new decision within 11 months. As the carriers observe, section 10-201(e)(vi) (*id.* § 10-201(e)(vi)) imposes a different schedule. Also, we deny the objectors' request that, on remand, we restrict the throughput of the pipeline to 570,000 barrels per day.

¶ 151　　　　　Vacated and remanded with directions.

**No. 4-21-0008**

| | |
|---|---|
| **Cite as:** | *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008 |
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, No. 19-0673. |
| **Attorneys for Appellant:** | John D. Albers and Williams M. Shay, of Shay Law, Ltd., of Peoria, for appellants. |
| **Attorneys for Appellee:** | Robert W. Funk, Rebecca L. Segal, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for appellee Illinois Commerce Commission. |
| | Claire A. Manning and Anthony D. Schuering, of Brown, Hay & Stephens, LLP, of Springfield, Owen MacBride, Bina Joshi, and Amy Antoniolli, of Schiff Hardin LLP, of Chicago, and Bret Dublinske, of Fredrikson & Byron, P.A., of Des Moines, Iowa, for appellees Dakota Access, LLC, and Energy Transfer Crude Oil Company, LLC. |
| | Jeff Naville, of Springfield, and Patrick K. Shinners, of Schuchat, Cook & Werner, of St. Louis, Missouri, for other appellees. |