**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240697-U

Order filed September 24, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY, | ) | Petition for Review of Orders of the |
| | ) | Illinois Commerce Commission, |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-24-0697 |
| v. | ) | ICC Docket No. 24-0304 |
| | ) | |
| THE ILLINOIS COMMERCE COMMISSION, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The Illinois Commerce Commission did not err in its interpretation and application of the Public Utilities Act, and substantial evidence supported its finding as to the public utility's rate of common equity in determining the public utility's capital structure. Affirmed.

¶ 2    Petitioner, Commonwealth Edison Company (ComEd), appeals from a decision by the Illinois Commerce Commission (Commission) following a reconciliation proceeding for ComEd's 2023 electronic delivery service rates and from the Commission's denial of ComEd's application for rehearing. ComEd petitioned for direct administrative review of the

Commission's decision. See 220 ILCS 5/10-201(a)-(b) (West 2022); Ill. S. Ct. R. 335 (eff. July 1, 2017). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        ComEd's arguments on appeal center on the Commission's findings with respect to ComEd's capital structure. We therefore review the applicable statutory provisions, procedural history, and the Commission's decision only as they pertain to this issue.

¶ 5                                    A. Public Utilities Act

¶ 6        ComEd is a public utility that provides electric delivery services to customers in Illinois. As a public utility, ComEd's rates are subject to regulation by the State of Illinois pursuant to the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2022)). The Commission, whose powers and duties are set forth in the Act, is the administrative agency charged with approving the rates that public utilities may charge their customers. See *id.* §§ 4-101, 9-102; *Citizens Utility Board v. Illinois Commerce Comm'n*, 2016 IL App (1st) 152936, ¶ 8.

¶ 7        In 2011, the General Assembly enacted the Energy Infrastructure Modernization Act (EIMA) (220 ILCS 5/16-108.5 (West 2012)) to stimulate investment by utilities in the State's energy infrastructure. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 130302, ¶¶ 4-5 (explaining history and purpose of EIMA). The Commission explains that the program "allows a utility to recover its expenditures and a rate of return on invested capital through a statutory ratemaking process in a performance-based formula rate." 220 ILCS 5/16-108.5(b) (West 2022). ComEd is a "participating utility" as defined in section 16-108.5(b).

¶ 8        EIMA requires that the performance-based formula rate approved by the Commission, *inter alia*, "[p]rovide for the recovery of the utility's actual costs of delivery services that are prudently incurred and reasonable in amount consistent with Commission practice and law" and

2

"[r]eflect the utility's actual year-end capital structure for the applicable calendar year, excluding goodwill, subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(1)-(2). EIMA further requires that the performance-based formula rate "be updated annually with transparent information that reflects the utility's actual costs to be recovered during the applicable rate year ***." *Id.* § 16-108.5(c).

¶ 9        As referenced in section 16-108.5(c)(2), a utility's "capital structure" is the combination of equity and debt used to finance its operations. As the Commission explains,

"A utility's capital structure—the proportion of debt and equity capital—together with the utility's costs of the various types of capital derives the utility's overall or " 'weighted average cost of capital,' " which is the rate of return that a utility is authorized to earn on its net rate base." [Citation.] This weighted average cost of capital (*i.e.*, rate of return), when multiplied by the value of the utility's net rate base, is designed to produce sufficient earnings and cash flow to allow the utility to maintain the financial integrity of its existing invested capital, maintain its creditworthiness, attract sufficient capital on competitive terms to continue to provide a source of funds for continued investment, and enable it to continue to meet the needs of its customers."

See generally *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 440-41 (1993) (quoting *Citizens Utilities Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988) (describing a utility's capital structure and its role in a utility's authorized rate of return and the formula for revenue requirement, *i.e.*, rate base multiplied by the rate of return on capital plus operating expenses)).

¶ 10        The rate reconciliation process is set forth in section 16-108.5(d) of the Act, as follows in relevant part:

"Within 45 days after the utility files its annual update of cost inputs to the performance-based formula rate, the Commission shall have the authority *** to enter upon a hearing concerning the prudence and reasonableness of the costs incurred by the utility to be recovered during the applicable rate year that are reflected in the inputs to the performance-based formula rate derived from the utility's FERC Form 1. During the course of the hearing, each objection shall be stated with particularity and evidence provided in support thereof, after which the utility shall have the opportunity to rebut the evidence." 220 ILCS 5/16-108.5(d).

¶ 11 The Commission "shall apply the same evidentiary standards, including, but not limited to, those concerning the prudence and reasonableness of the costs incurred by the utility, in the hearing as it would apply in a hearing to review a filing for a general increase in rates under Article IX of this Act." *Id*. In the event the Commission does not enter upon a hearing in this manner, "then the costs incurred for the applicable calendar year shall be deemed prudent and reasonable ***." *Id.*

¶ 12 In 2023, ComEd provided electric delivery services to customers under performance-based formula rates established pursuant to section 16-108.5. Thus, the rates ComEd charged were based on projections of 2023 costs and subject to reconciliation once actual costs were known. See *id.* §§ 16-108.5, 16-108.25. While section 16-108.5 became inoperative effective December 31, 2022 (see *id.* § 16-108.5(h)), the parties do not dispute that the provisions apply to this proceeding. The parties explain that the General Assembly provided a bridge from the performance-based formula rate to a new performance-based ratemaking mechanism. See *id.* § 108.25 ("Each electric utility that files a Multi-Year Rate Plan pursuant to Section 16-108.18 of this Act ["Performance-based ratemaking"] or a general rate case as described in this Act shall

4

also file a tariff that sets forth the processes and procedures by which the electric utility will transition from its current rates and ratemaking mechanism to the new Multi-Year Rate Plan or a general rate case and rates that will take effect under that multi-year plan.").

¶ 13    Pursuant to section 16-108.25, ComEd filed, and the Commission approved, "Rider DSPR—Delivery Service Pricing Reconciliation tariff" (Rider DSPR), setting forth the processes and procedures by which ComEd will transition from its then-current rates and ratemaking mechanism. A "tariff" in this context is "a public document setting forth services being offered, the rates and charges with respect to services, and the governing rules, regulations, and practices relating to those services." *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 28. This is the second and final DSPR proceeding pursuant to the bridge provision of section 16-108.25, with ComEd transitioning to a multi-year rate plan beginning in 2024.

¶ 14                                    B. Procedural History

¶ 15    On April 26, 2024, ComEd filed a verified petition to reconcile the projected costs on which 2023 rates were based with the actual costs it incurred in that year. ComEd requested the Commission adopt its actual year-end capital structure for 2023, which consisted of 50.07% common equity, 49.72% long-term debt, and 0.21% short-term debt. Commission Staff recommended that the Commission reject ComEd's proposed capital structure as more than reasonably necessary to provide the company's services and to maintain its financial integrity and that it instead adopt Staff's recommended capital structure reflecting 50% common equity, 49.79% long-term debt, and 0.21% short-term debt as reasonable and prudent. In support, Staff argued that ComEd failed to prove that a higher common equity ratio of 50.07% was necessary for the company to provide its services and to maintain its financial strength. Staff noted that its recommended capital structure is the same capital structure (50% common equity and 50% debt)

the Commission approved as prudent and reasonable in the first DSPR order. The Illinois Attorney General appeared and likewise urged the Commission to reject ComEd's capital structure and adopt a capital structure with a 50% common equity ratio. The parties submitted supporting testimony, as detailed in relevant part below.

¶ 16                                    1. ComEd (Direct)

¶ 17         Jason Decker, ComEd's Vice President of Regulatory Policy and Strategy, testified regarding market conditions during the applicable time period. Decker outlined the external market and economic factors that impacted ComEd's cost of capital and overall delivery reconciliation amount. Namely, in the year preceding the rate year at issue, "interest rates were kept low to support economic recovery efforts from the COVID-19 pandemic, but as the pandemic eased[,] inflation began to rise." Thus, ComEd (and other electric utilities) faced increased costs and the rise in the Federal Reserve's interest rates. Decker explained that the combination of inflation and increased interest rates resulted in higher borrowing costs. Specifically, ComEd's 2023 cost of capital and interest were higher than projected due to a significant rise in United States Treasury bond yields that "increased both ComEd's borrowing and other capital costs as defined in the law, including increasing the cost of equity from 7.85% to 9.89%."

¶ 18         Rachel Isbell, ComEd's Director of Financial Planning and Analysis, testified that ComEd's actual year-end capital structure as of December 31, 2023, was comprised of 50.07% equity (excluding goodwill), 49.72% long-term debt, and 0.21% short-term debt. She opined that ComEd's "2023 actual capital structure was consistent with sound financial practice, and reflected a degree of leverage that includes an appropriate level of risk while also maintaining a level of financial strength and integrity that investors view as sufficient for access to capital

6

markets." Isbell further opined that ComEd's actual 2023 capital structure "appropriately balanced the interests of: (i) customers to have reliable service at a reasonable cost; (ii) debt holders to be assured that their interest payments will be made as promised and their principal will be repaid at maturity; and (iii) equity investors to receive competitive dividends and earnings that justify their continued capital commitments." According to Isbell, the 2023 actual capital structure reflected "market conditions, including a heightened inflationary environment, that necessitated a strong financial position in order to ensure access to capital on favorable terms."

¶ 19                                    2. Staff

¶ 20        Joachim Nyame, a financial analyst in the Finance Department of the Commission's Financial Analysis Division, proposed that the Commission adopt a capital structure with no more than 50% common equity. In support, Nyame explained:

> "Up to year-end 2022, ComEd's authorized common equity under the formula rate plan ('FRP') had only peaked at 49.45%.[] Under the FRP, ComEd's credit ratings from both Moody's Investors Service and Standard & Poor's were upgraded multiple times.[] These favorable ratings indicate improvement in ComEd's financial strength and unimpaired ability to attract capital while operating with common equity ratios below the 50% threshold. ComEd has not demonstrated that a common equity ratio of 50.07% is necessary for the Company to maintain and improve its credit rating, enable it [*sic*] attract capital on more favorable terms, and offer satisfactory return to investors. Consequently, I propose a capital structure with 50% common equity for ComEd's Rider DSPR ***."

¶ 21        Nyame concluded that a capital structure with 50% common equity was sufficient for ComEd to reasonably provide its services and continue to maintain and improve its financial

7

strength. Nyame further noted that his recommended capital structure is the same capital structure that the Commission found reasonable and approved in the first DSPR reconciliation proceeding.

¶ 22                                    3. ComEd (Rebuttal)

¶ 23        In rebuttal, Ana Stacy N. Diccion, ComEd's Senior Manager of Revenue Policy, testified in response to Nyame's recommended capital structure. Diccion explained ComEd's process for determining its capital structure and affirmed Isbell's conclusion that ComEd's 2023 actual year end capital structure was reasonable and prudent given the specific market conditions faced by ComEd at the time. Stating that the only evidence cited by Staff was that ComEd's capital structure has historically contained no more than 50% common equity, Diccion testified that the historical evidence did not demonstrate that ComEd's 2023 capital structure was either unreasonable or imprudent. Diccion also testified that approval of a capital structure with 50% common equity would result in a $1.191 million reduction to ComEd's delivery reconciliation amount.

¶ 24                                    C. Commission Decision

¶ 25        The Commission issued its decision on October 31, 2024. The Commission rejected ComEd's actual 2023 year-end capital structure (with 50.07% common equity) and adopted a capital structure of no more than 50% common equity, as recommended by Nyame. Citing the plain language of section 16-108.5(c)(2), requiring the use of a utility's actual capital structure "subject to a determination of prudence and reasonableness," the Commission concluded that ComEd bears the burden of proving that its proposed capital structure is prudent and reasonable. In other words, "ComEd can propose its actual year-end capital structure, and the Commission will determine whether it is prudent and reasonable." The Commission noted that the utility's

burden in this regard is well established, citing section 9-201(c) of the Act (220 ILCS 5/9-201(c) (West 2022)), which provides that, in a proceeding regarding the propriety of a proposed rate, the utility bears the burden of proving that the proposed rates are just and reasonable, and *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n,* 2013 App (3d) 100832, ¶ 54 ("Under the Act, a utility bears the burden to establish that its proposed rates are just and reasonable.").

¶ 26 The Commission found that ComEd failed to demonstrate that a capital structure comprised of 50.07% common equity is prudent and reasonable. The Commission reasoned:

> "The Commission finds that ComEd does not offer evidentiary support for its argument that the 'heightened inflationary environment' necessitates a capital structure of 50.07% common equity. While the Commission is mindful of current economic conditions, it notes that for the last decade, up to and including last year, ComEd operated with an approved common equity ratio no greater than 50.00%. During that period ComEd improved its financial strength with multiple credit rating upgrades from both Moody's and S&P. The Commission finds that simply citing current economic conditions, without further explaining the correlation between the stated condition and the proposed capital structure, is not persuasive."

Accordingly, the Commission adopted a capital structure consisting of 50% common equity, 49.79% long-term debt, and .21% short-term debt.

¶ 27 Subsequently, the Commission denied ComEd's application for rehearing. ComEd timely filed a petition for direct administrative review.

## II. ANALYSIS

¶ 28    Judicial review of Commission decisions involves the exercise of special statutory jurisdiction and is constrained by provisions of the Act. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2019 IL App (2d) 180504, ¶ 51. The Commission's findings of fact are considered *prima facie* true, and its orders are reviewed as *prima facie* reasonable. 220 ILCS 5/10-201(d) (West 2022). ComEd, as the entity appealing from the Commission's final order, bears the burden of proof on all issues raised on appeal. *Id.*; *Commonwealth Edison*, 2019 IL App (2d) 180504, ¶ 51.

¶ 29    A reviewing court will reverse a Commission's order "only if the Commission's findings are not supported by substantial evidence based on the record; the Commission acted outside the scope of its statutory authority; the Commission issued findings in violation of the State or Federal Constitution or law; or the proceedings or the manner in which the Commission reached its findings violates the State or Federal Constitution or laws, to the prejudice of the appellant." *Citizens Utility Board v. Illinois Commerce Comm'n,* 166 Ill. 2d 111, 120-21 (1995) (citing 220 ILCS 5/10-201(e)(iv)(A) through (e)(iv)(D) (West 1992)). In addressing the deference accorded Commission decisions, our supreme court explained, "[O]ur authority is deferential by statute, but it is also by nature. Simply put, we are judges, not utility regulators. Though we are free to disagree with the Commission on what the Act means, we remain hesitant to disregard how the Commission applies it." (Internal citations omitted.) *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 22. Deference is particularly appropriate regarding fixing rates, as "[a] rate is more than a number; it is also a design." *Id.* ¶ 23. "The Commission's decision in a rate case does not involve simply what utilities may charge their customers, but how they do so," and "that decision depends largely upon the Commission's experience and expertise in its field." *Id.*

10

¶ 30    With these concepts in mind, we turn to the issues ComEd raises on appeal. ComEd first argues that the Commission erred by shifting the statutory burden to ComEd to prove that its proposed capital structure was prudent and reasonable. Next, ComEd contends that the Commission erred by misinterpreting the prudence standard in assessing ComEd's capital structure. In this regard, ComEd also challenges the Commission's finding that ComEd failed to demonstrate the prudence and reasonableness of its capital structure. For the reasons set forth below, we disagree with ComEd's arguments and affirm the Commission's decision.

¶ 31                                    A. Burden

¶ 32    The parties dispute the burden of proof under section 16-108.5(c)(2) of the Act, which provides that, in a reconciliation, a utility's rates must "[r]eflect the utility's actual year-end capital structure for the applicable calendar year, excluding good will, subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(2) (West 2022). ComEd argues that the Commission's determination—that ComEd bears the burden of proving its proposed capital structure is prudent and reasonable under section 16-108.5(c)(2)—contradicts the plain language of the statute. According to ComEd, the statute provides that the "default rule" is that the Commission must use a utility's actual capital structure in a reconciliation and that this rule may be overcome only upon a determination, made consistent with Commission practice and law, of imprudence or unreasonableness. The Commission counters that the plain language of section 16-108.5(c)(2), provisions set forth in article IX of the Act (governing rates), and well-established case law support the Commission's determination that ComEd must prove its actual capital structure *and* that the actual capital structure is prudent and reasonable. The Commission further argues that, regardless, ComEd fails to demonstrate prejudice, as required by section 10-201(e)(iv)(D).

11

¶ 33    The primary goal in interpreting a statute is to ascertain and give effect to the legislature's intent, which is best indicated by the plain language of the statute. *Commonwealth Edison*, 2019 IL App (2d) 180504 ¶ 55. Statutes must be read as a whole, not in isolation, with all relevant parts of the statute considered (see *id.*), and we may not read into the statute exceptions, limitations, or conditions that the legislature did not express (see *Sheffler*, 2011 IL 110166, ¶ 75). The interpretation of a statute presents a question of law; thus, we review the issue *de novo*. See *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29 (the Commission's rulings on questions of law are reviewed *de novo*).

¶ 34    The plain language of section 16-108.5(c)(2) provides that, in a reconciliation, a public utility's actual year-end capital structure is subject to a determination of prudence and reasonableness, although the provision does not explicitly state who bears the burden on this issue. However, a review of the entirety of the Act reflects a clear legislative intent to impose this burden on the public utility. To begin, a tariff, like the DSPR tariff, is a "rate" under the Act. See *Bloom Township High School v. Illinois Commerce Comm'n*, 309 Ill. App. 3d 163, 175 (1999) (a utility tariff falls within the Act's definition of "rate") (citing 220 ILCS 5/3-116 (West 1998) (" '[R]ate' includes every individual or joint rate, fare, toll, charge, rental or other compensation of any public utility *** or any schedule or tariff thereof, and any rule, regulation, charge, practice or contract relating thereto.")).

¶ 35    Article IX of the Act addresses rates; specifically, section 9-101 of the Act (220 ILCS 5/9-101 (West 2022)) requires that all rates or other charges be "just and reasonable" and provides that any "unjust or unreasonable charge made, demanded or received *** is hereby prohibited and declared unlawful." In turn, section 9-201(c) provides:

"If the Commission enters upon a hearing concerning the propriety of any proposed rate or other charge, classification, contract, practice, rule or regulation, the Commission shall establish the rates or other charges, classifications, contracts, practices, rules or regulations proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable. *In such hearing, the burden of proof to establish the justness and reasonableness of the proposed rates or other charges, classifications, contracts, practices, rules or regulations, in whole and in part, shall be upon the utility.* *** No rate or other charge, classification, contract, practice, rule or regulation shall be found just and reasonable unless it is consistent with Sections of this Article." (Emphasis added.) *Id*. § 9-201(c).

¶ 36         In other words, "[s]ection 9-201(c) of the Act provides that, if the Commission initiates a proceeding concerning the appropriateness of a utility's proposed rates, the utility has the burden of proving that the proposed rates are just and reasonable." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 130302, ¶ 28. Considering this burden, the appellate court in *Citizens Utility Board v. Illinois Commerce Comm'n*, 276 Ill. App. 3d 730, 746 (1995), explained that, to meet its burden of proving that its proposed rates are just and reasonable under section 9-201(c), "the utility must prove the reasonableness of the values it places on the components of the revenue requirement." Specifically, the utility must establish that "its operating costs are reasonable, its rate base is the reasonable value of its property used for serving the public, and its rate of return on capital is the reasonable cost of the capital needed to provide the services." *Id.* As to capital structure in particular, "the Commission should disallow recovery of any costs of capital in excess of that reasonably necessary for the provision of services. If a utility has included excessive equity in its capital structure, it has inflated the rate of

13

return and its capital cost." *Id.* Taken together, the provisions of sections 9-101 and 9-201 reflect a legislative intent to impose on the utility the burden to prove the prudence and reasonableness of its capital structure.

¶ 37 In addition, section 9-230 of the Act provides that, "[i]n determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include any (i) incremental risk, (ii) increased cost of capital, \*\*\*, which is the direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." 220 ILCS 5/9-230 (West 2022). Citing this provision, the appellate court in *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008, ¶¶ 27, 29, rejected the public utility's contention that the language in section 16-108.5(c)(2) creates a presumption that its proposed capital structure was appropriate. The court reasoned that "[t]he plain language of the statute provides the Commission with the discretion to determine whether Ameren's proposed capital structure is prudent and reasonable," and disagreed with the public utility's "contention that the statutory language creates a presumption of reasonableness when read in conjunction with provisions of the Utilities Act." *Id.* ¶ 29 (citing 220 ILCS 5/9-230 (West 2012)).

¶ 38 Notwithstanding, ComEd contends that the provisions of article IX are not applicable to the interpretation of section 16-108.5(c)(2). This argument ignores that statutes must be read as a whole, not in isolation, with all relevant parts of the statute considered. See *Commonwealth Edison*, 2019 IL App (2d) 180504 ¶ 55. In setting forth the rate reconciliation process, section 16-108.5(d) explicitly cross-references article IX, providing that the Commission "shall apply the same evidentiary standards, including, but not limited to, those concerning the prudence and reasonableness of the costs incurred by the utility, in the hearing as it would apply in a hearing to

14

review a filing for a general increase in rates *under Article IX of this Act*." (Emphasis added.)

220 ILCS 5/16-108.5(d) (West 2022). Equally unavailing, then, is ComEd's reliance on section

16-108.5(d) for its argument that, "when a utility 'file[s] its annual update of cost inputs to the

performance-based formula rate,' those actual '*costs incurred* for the applicable calendar year

*shall be deemed prudent and reasonable*' unless the Commission holds a hearing." However,

section 16-108.5(d) simply provides that, if the Commission does *not* "enter upon a hearing

concerning the prudence and reasonableness of the costs incurred by the utility," then costs shall

be deemed prudent and reasonable. See *id.* Likewise, the requirement that, in the event of a

hearing, "each objection shall be stated with particularity and evidence provided in support

thereof, after which the utility shall have the opportunity to rebut the evidence" does not

eliminate ComEd's substantive, statutory burden to prove the prudence and reasonableness of its

actual capital structure. See *id.*

¶ 39      Further regarding section 9-230, we note the Commission's argument that any

presumption that ComEd's actual capital structure is prudent and reasonable would conflict with

the Commission's obligation under section 9-230 to determine whether ComEd's risk or cost of

capital increased because of its affiliation with its parent Exelon Corporation (Exelon). The

Commission also cites numerous cases interpreting section 9-230. See, *e.g.*, *Ameren Illinois Co.

v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140173, ¶¶ 111-12 (construing the phrase

"shall not include any incremental risk" in section 9-230 as an "absolute prohibition" on

allowing a utility to recover a reasonable amount of increased risk or cost of capital caused by

the utility's affiliation with unregulated or nonutility companies); *Illinois Bell Telephone Co. v.

Illinois Commerce Comm'n*, 283 Ill. App. 3d 188, 207-08 (1996) (reversing the Commission's

decision that Illinois Bell's capital structure was reasonable where the Commission failed to also

determine whether Illinois Bell's risk or capital costs were greater because of the affiliation with its parent Ameritech Corporation). ComEd responds at length to this argument, taking issue with any reliance on section 9-230 and this jurisprudence, as there was no allegation nor any evidence presented below that there was any such increased risk or cost of capital due to ComEd's affiliation with Exelon. However, the point is merely that, given the Commission's obligation under section 9-230, the statutory language further supports the Commission's interpretation that a public utility bears the burden of establishing that its capital structure is prudent and reasonable.

¶ 40    ComEd maintains that the use of its actual capital structure, not a "hypothetical" capital structure, is "consistent with Commission practice and law," as contemplated by the language in section 16-108.5(c)(2), requiring that a utility's performance-based formula rate must "[r]eflect the utility's actual year-end capital structure for the applicable calendar year, excluding good will, subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(2) (West 2022). Citing a litany of Commission decisions, ComEd argues that the Commission has long held that a hypothetical capital structure should only be used when the utility's actual capital structure is found to be unreasonable, imprudent, or unfairly burdensome. ComEd further asserts that this standard is reflected in appellate court precedent. See *Apple Canyon*, 2013 IL App (3d) 100832, ¶ 54 (once a utility establishes a *prima facie* case by making a showing of the costs necessary to provide service under its proposed charges, the burden shifts to others to show that the costs incurred by the utility are unreasonable because of inefficiency or bad faith); *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 327 Ill. App. 3d 768, 776 (2002) (same); *City of Chicago v. Illinois Commerce Comm'n*, 133 Ill. App. 3d 435, 443 (1985) (same).

16

¶ 41 However, as the Commission points out, these cases addressed the burden of production, not the ultimate statutory burden of proof. Also, the proposition for which these cases purportedly stand is more nuanced. As the court in *Apple Canyon* explained, the utility bears the burden of establishing that its proposed rates are just and reasonable under the Act and that "[o]nce a utility makes a showing of the costs *necessary to provide service* under its proposed charges," the burden then shifts to others to establish that the costs incurred by the utility are unreasonable because of inefficiency or bad faith. (Emphasis added.) *Apple Canyon*, 2013 IL App (3d) 100832, ¶ 54. Here, however, ComEd contends that it need only establish the *accuracy* of its actual capital structure and not also the necessity of its costs. *Apple Canyon*, *Illinois Bell*, and *City of Chicago* do not support this position.

¶ 42 Nor does legal authority support ComEd's suggestion that other parties bear the burden to prove that its actual capital structure is imprudent or unreasonable. To the contrary, our supreme court has explained that the Commission "may not rely on intervening parties to contest a rate increase or to challenge the evidence offered by the utility." *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 117 Ill. 2d 120, 135 (1987). Indeed, "any participation by persons or groups opposing an increase is voluntary and purely fortuitous"; thus, "[r]equiring intervenors to establish unreasonableness is therefore no substitute for requiring proof of reasonableness." *Id.* at 135-36. In sum, we reject ComEd's argument that the Commission erred by shifting the statutory burden to ComEd to prove that its proposed capital structure was prudent and reasonable. In light of our holding, we need not address the Commission's alternative argument that ComEd failed to demonstrate prejudice as a result of the Commission's determination as to the burden of proof.

¶ 43                                B. Capital Structure

17

¶ 44 ComEd challenges the Commission's finding—that ComEd failed to demonstrate the prudence and reasonableness of its capital structure—as not supported by substantial evidence. As it relates to "prudence," section 16-108.5(c)(2) provides that the performance-based formula rate approved by the Commission shall "[r]eflect the utility's actual year-end capital structure for the applicable calendar year, excluding goodwill, subject to a determination of prudence and reasonableness consistent with Commission practice and law." 220 ILCS 5/16-108.5(c)(2) (West 2022). Both parties on appeal agree that, while not defined in the Act, prudence is "that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made." (Internal quotation marks omitted.) *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008). ComEd asserts that the Commission misconstrued and misapplied this standard by relying on ComEd's historical common equity ratio, rather than conditions that existed at the time decisions were made. In turning to this issue, we observe that ComEd's argument is intertwined with its challenge to the sufficiency of the evidence to support the Commission's finding that ComEd failed to demonstrate the prudence and reasonableness of its capital structure. We address both arguments together.

¶ 45 A party challenging the Commission's factual findings bears the burden of showing that the order was not supported by "substantial evidence." 220 ILCS 5/10-201(e)(iv)(A) (West 2022). "Substantial evidence" has been defined as "evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence." *Ameren Illinois*, 2013 IL App (4th) 121008, ¶ 18. In other words, "if reasonable minds (thinking reasonably) could differ as to where the preponderance of the evidence lies, the reviewing court should defer to the Commission's

18

finding or conclusion of fact." *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 37. Merely showing that the evidence presented could support a conclusion different from the Commission's conclusion is insufficient; rather, the party challenging the decision must affirmatively demonstrate that the opposite conclusion is clearly evident. *Apple Canyon*, 2013 IL App (3d) 100832, ¶¶ 20, 57; *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994). Accordingly, the substantial-evidence standard is akin to the manifest-weight-of-the-evidence standard, *i.e.*, " '[a] finding is against the manifest weight of the evidence if all reasonable persons would agree that the finding is erroneous and that the opposite conclusion is evident.' " *Save Our Illinois Land*, 2022 IL App (4th) 210008, ¶ 37 (quoting *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 934 (1995)).

¶ 46        ComEd challenges the Commission's finding as to ComEd's capital structure. Actual capital structure is comprised of short-term debt, long-term debt, and common equity. *Ameren Illinois*, 2013 IL App (4th) 121008 ¶ 22. Equity is generally a more expensive form of capital as compared to debt. *Id.* ¶ 30. "Therefore, the more equity in a utility's capital structure, the higher the [rate of return] must be to cover the cost of capital." *Illinois Bell,* 283 Ill. App. 3d at 204.

¶ 47        Here, the Commission adopted a capital structure consisting of 50% common equity, 49.79% long-term debt, and .21% short-term debt, finding the 50% common equity ratio prudent and reasonable. As discussed, ComEd challenges the Commission's reliance on ComEd's historical common equity ratio, characterizing this finding as the sole basis for the Commission's decision, but the record reflects otherwise. In reasoning that ComEd failed to offer evidentiary support for its position that the heightened inflationary environment necessitated a capital structure of 50.07% common equity, the Commission noted that for the last decade (up to and

19

including the prior year), ComEd had operated with a common equity ratio no greater than 50% while simultaneously improving its financial strength with credit rating upgrades. However, in doing so, the Commission explicitly noted that it was mindful of current economic conditions but that ComEd's mere citation to current economic conditions "without further explaining the correlation between the stated condition and the proposed capital structure, is not persuasive." Accordingly, the Commission adopted a capital structure consisting of 50% common equity, 49.79% long-term debt, and .21% short-term debt and rejected ComEd's actual capital structure comprised of 50.07% common equity as more than reasonably necessary to provide its utility services and to maintain its financial strength.

¶ 48    Our review of the record reflects that substantial evidence supports the Commission's finding and that ComEd fails to demonstrate that the opposite conclusion is clearly evident. Namely, Nyame testified that a 50% common equity ratio was reasonable and would allow ComEd to maintain and improve its credit rating, attract capital on favorable terms, and adequately compensate investors. Nyame further testified regarding ComEd's prior Commission-approved capital structures and the simultaneous improvements in ComEd's financial strength and improved credit ratings. ComEd challenges Nyame's testimony on grounds that he did not dispute ComEd's actual 2023 capital structure, with its common equity portion of 50.07%, and failed to address the market conditions outlined by Decker. Moreover, ComEd maintains that Isbell's testimony that ComEd's actual 2023 capital structure appropriately balanced the interests of customers, debt holders and equity investors in the "heightened inflationary environment" should have been credited. The Commission, in turn, responds that Isbell failed to identify any factors underlying these conclusions.

¶ 49        Ultimately, however, it is not our job to reevaluate witness credibility, reweigh the evidence, or substitute our judgment for that of the Commission's. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 398 (2010). The Commission credited Nyame's testimony and specifically noted the lack of any evidentiary support for the proposition that the current economic conditions necessitated a capital structure of 50.07% common equity. The mere presentation of contradictory evidence does not present a basis to reverse the Commission's decision. See *Metro Utility Co. v. Illinois Commerce Comm'n*, 262 Ill. App. 3d 266, 278 (1994) (considering the Staff witness's testimony that the utility could refinance its loan at a lower rate, "[t]he fact that Metro presented contradictory evidence is insufficient to reverse the Commission's order because a reviewing court may not substitute its interpretation of the evidence for that of the Commission"). Based upon the evidence presented, the Commission adopted a capital structure consisting of 50% common equity. This finding was supported by substantial evidence, and ComEd fails to demonstrate that the opposite conclusion is clearly evident.

¶ 50                           III. CONCLUSION

¶ 51        For the reasons stated, we affirm the Commission's decision.

¶ 52        Affirmed.